LARRY E. HALVORSON
MICHAEL B. SAUNDERS
HALVORSON & SAUNDERS, P.L.L.C.
800 Fifth Avenue
Suite 4100
Seattle, WA 98104
206-386-7789

**ORIGINAL**

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

AUG 30 2000

JAMES R. LARSAN CLERK
_____ DEPUTY
SPOKANE, WASHINGTON

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

## CT-00-5070-AAM

FLUOR DANIEL HANFORD, INC.,

      Plaintiff,

Vs.

HANFORD ATOMIC METAL
TRADES COUNCIL, AFL-CIO,

      Defendant.

Case No.:

**COMPLAINT TO VACATE
ARBITRATION AWARD**

Plaintiff Fluor Daniel Hanford, Inc. ("Fluor Daniel"), alleges as follows:

**JURISDICTION**

1. This action is brought to vacate a labor arbitration award, and arises under, and

jurisdiction is conferred on this Court by virtue of, § 301 of the Labor

Management Relations Act, 1947 (29 USCA § 185), hereinafter referred to as

"the Act".

COMPLAINT TO VACATE ARBITRATION AWARD- 1

HALVORSON & SAUNDERS, P.L.L.C.
800 FIFTH AVENUE
SUITE 4100
SEATTLE, WA 98104
TEL: (206) 386-7788 - HALVORSON
(206) 386-7789 - SAUNDERS
FAX: (206) 386-7856

**PARTIES AND VENUE**

2.   Fluor Daniel Hanford, Inc. ("Fluor Daniel") is a Washington corporation,

having its principal office and place of business located in the City of Richland,

State of Washington, within the territorial jurisdiction of this Court, and is an

employer in an industry affecting commerce, as defined in §§ 2(2) and 501(1)

and (3) of the Act ( 29 USCA § 152(2), 142(1) and (3)), and within the meaning

of § 301 thereof (29 USCA § 185).

3.   Defendant Hanford Atomic Metal Trades Council ("HAMTC") is a labor

organization representing employees in an industry affecting commerce, as

defined in §§ 2(5) and 501(i) and (3) of the Act ( 29 USCA § 152(5), 142(1)

and (3)), and within the meaning of § 301 thereof (29 USCA § 185). HAMTC

maintains its principal offices and HAMTC's duly authorized officers or agents

are engaged in representing or acting for employee members in the City of

Richland, State of Washington, within the territorial jurisdiction of this Court.

**FACTUAL ALLEGATIONS**

4.   On August 7, 1997, the parties hereto executed a collective bargaining

agreement, covering certain classifications of plaintiff's employees, which

included, among other provisions, a procedure for processing and adjusting

grievances, including binding arbitration as the final step thereof.  A copy of

the agreement is attached hereto as Exhibit A, and reference is hereby made to

COMPLAINT TO VACATE ARBITRATION AWARD- 2

HALVORSON & SAUNDERS, P.L.L.C.
800 FIFTH AVENUE
SUITE 4100
SEATTLE, WA 98104
TEL:   (206) 386-7788 - HALVORSON
(206) 386-7789 - SAUNDERS
FAX: (206) 386-7856

Articles XVII and XVIII, in which the Grievance and Arbitration provisions are set forth. As appears from these provisions of the agreement, the powers of the arbitrator with respect to interpretation and application of the agreement, and the remedies the arbitrator may afford in making his award, are limited in the following respects: *"[T]he arbitrator shall not have the authority to add to, disregard, or to modify any of the terms of this Agreement."* (Emphasis added). (Exhibit A, page 92, Article XVIII, section 2).

5.  Page v of the labor agreement states in relevant part: "[T]his Agreement is made and entered into this seventh day of August 1997 by and between Fluor Daniel Hanford, Inc., its successors, hereinafter called 'the Employer,' and the Hanford Atomic Metal Trades Council, AFL-CIO, hereinafter called 'the Council,' *and is applicable to all work done under the Project Hanford Management Contract, by the work force defined in Article I of the Collective Bargaining Agreement."* (Emphasis added). Fluor Daniel Hanford, Inc. team members and their successors also will adhere to this Collective Bargaining Agreement *for work under the aforementioned Project Hanford Management Contract . . . ."* (Emphasis added). (Exhibit A, page v).

6.  Article I of the labor agreement states in relevant part: "[T]he Employer, *in the operations of all its Hanford contracts,* agrees to recognize the Hanford Atomic Metal Trades Council as the sole collective bargaining representative in all

COMPLAINT TO VACATE ARBITRATION AWARD- 3

HALVORSON & SAUNDERS, P.L.L.C.
800 FIFTH AVENUE
SUITE 4100
SEATTLE, WA 98104
TEL: (206) 386-7788 - HALVORSON
(206) 386-7789 - SAUNDERS
FAX: (206) 386-7856

matters pertaining to wages, hours, and working conditions, for all employees in

the bargaining unit as defined by the National Labor Relations Board in all

applicable certifications and recognitions and whom it employs *at and for the*

*Project Hanford Management Contract: . . . .*" (Emphasis added). (Exhibit A,

page 1).

7.    Cogema Engineering Corporation ("Cogema") is an "enterprise company" as

referenced in the introduction on page v of the labor agreement. (Exhibit A,

page v). Cogema provides certain engineering and technical services to Fluor

Daniel in connection with the Project Hanford Management Contract

("PHMC"). Cogema also performs work that is not covered by the PHMC in

accordance with the Department of Energy's goal of diversifying the economy

of the Tri-Cities area.

8.    On October 30 and 31, 1998, Cogema hired Bekins Northwest to move its

office furniture, equipment and supplies from the Tri-City Professional Center

at 1200 Jadwin Avenue to 2425 Stevens Center. Both addresses are located in

Richland, Washington, and both are outside the boundaries of the Department

of Energy's Hanford site.

9.    Cogema owned the furniture, equipment and supplies moved by Bekins

Northwest.

COMPLAINT TO VACATE ARBITRATION AWARD- 4

HALVORSON & SAUNDERS, P.L.L.C.
800 FIFTH AVENUE
SUITE 4100
SEATTLE, WA 98104
TEL:  (206) 386-7788 - HALVORSON
(206) 386-7789 - SAUNDERS
FAX: (206) 386-7856

10. Cogema paid for the move with its own corporate funds and neither the Department of Energy nor any government contractor reimbursed Cogema for the cost of the move by Bekins Northwest.

11. On November 5, 1998, HAMTC filed a grievance reading in material part as follows:

> We the Teamsters of Local 839 grieve the movement of all of the furniture, boxes, and the computers owned by COGEMA to an off site moving company. We feel that this action is a violation of the contract.

12. Fluor Daniel answered the grievance as followed:

> A grievance meeting was held on November 5, 1998 and attended by Chuck Cone, Jinny Howser of DYN [Dyncorp], Betty White, and Nancy Montano of FDH IR and Marty Talbott of COGEMA. The equipment and material in question was purchased by COGEMA Corporate funds and placed in a leased facility to be used primarily in support of non-PHMC work. The movement of the equipment was appropriately assigned. There was no violation of the FDH/HAMTC agreement.

13. The parties were unable to resolve the grievance in the steps of the grievance procedure preceding arbitration and selected M. Zane Lumbley to serve as arbitrator pursuant to Article XVIII of the labor agreement (Exhibit A).

14. A hearing was held before the arbitrator on March 16, 2000, in Richland, Washington. On June 10, 2000, the arbitrator rendered his award, incorporating the same in a written opinion, which award upheld the grievance filed by HAMTC and ordered and directed Fluor Daniel to cease and desist the contracting out of the moving of the furniture, equipment, and supplies of

COMPLAINT TO VACATE ARBITRATION AWARD- 5

HALVORSON & SAUNDERS, P.L.L.C.
800 FIFTH AVENUE
SUITE 4100
SEATTLE, WA 98104
TEL:  (206) 386-7788 - HALVORSON
(206) 386-7789 - SAUNDERS
FAX: (206) 386-7856

enterprise companies performing work at and for the Project Hanford Management Contract; and pay the union, at a rate to be determined by the Arbitrator, wages equivalent to 347.75 hours of work, said back pay to be distributed by the Union to its members who, in the Union's discretion, would have been assigned to perform the work had it not been assigned to an outside entity. A copy of the opinion and the award contained therein is attached hereto as Exhibit B. On July 18, 2000, the arbitrator issued his determination of the amount of back pay due pursuant to his award, which amounts to $10,002.23, plus interest. A copy of the arbitrator's backpay determination is attached hereto as Exhibit C.

15. By his award and back pay determination, the arbitrator "added to," "disregarded," or "modified" the terms of the labor agreement to cover non-PHMC work performed by enterprise companies like Cogema.

## CLAIM FOR RELIEF

16. Fluor Daniel alleges that the award was wholly void in that the arbitrator exceeded his powers with respect both to interpretation and application of the substantive provisions of the collective bargaining agreement and the remedies available to him under the arbitration provisions thereof.

WHEREFORE, plaintiff Fluor Daniel prays:

1. That this court enter a judgment vacating the arbitration award; and,

COMPLAINT TO VACATE ARBITRATION AWARD- 6

HALVORSON & SAUNDERS, P.L.L.C.
800 FIFTH AVENUE
SUITE 4100
SEATTLE, WA 98104
TEL:  (206) 386-7788 · HALVORSON
(206) 386-7789 · SAUNDERS
FAX: (206) 386-7856

2.   That this court grant plaintiff such other and further relief as may be

just and proper.

Dated this *28* day of August, 2000.

HALVORSON & SAUNDERS, P.L.L.C.

BY: _____

LARRY E. HALVORSON
WSBA No.7356
MICHAEL B. SAUNDERS
WSBA No. 22230
ATTORNEYS FOR PLAINTIFF
FLUOR DANIEL HANFORD, INC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

COMPLAINT TO VACATE ARBITRATION AWARD- 7

HALVORSON & SAUNDERS, P.L.L.C.
800 FIFTH AVENUE
SUITE 4100
SEATTLE, WA 98104
TEL:  (206) 386-7788 - HALVORSON
(206) 386-7789 - SAUNDERS
FAX:  (206) 386-7856

# EXHIBIT "A"

MANAGEMENT CONTRACT

# *1997 LABOR AGREEMENT*

BETWEEN

FLUOR DANIEL HANFORD, INC. (FDH)

AND

ATOMIC METAL TRADES

(HAMTC), AFL-CIO

RD, INC.

D x A

# TABLE OF CONTENTS

Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Preamble . . . . . . . . . . . . . . . . . . . . . . . . . . vi

## ARTICLES

| ARTICLE | TITLE | PAGE NO. |
|---|---|---|
| Article I | Union Recognition . . . . . . . . . . | 1 |
| Article II | Management Rights . . . . . . . . | 2 |
| Article III | Union Security/Dues Check-Off/Union Representation . . . . . . . . . . . | 3 |
| Article IV | Non-Discrimination . . . . . . . . | 10 |
| Article V | Jurisdiction . . . . . . . . . . . . . | 11 |
| Article VI | Health and Safety . . . . . . . . | 14 |
| Article VII | Hours of Work and Shifts . . . | 23 |
| Article VIII | Overtime and Premium Rates | 35 |
| Article IX | Time Off With Pay (TOWP) . . . | 46 |
| Article X | Joint Labor Management Committee . . . . . . . . . . . . . | 62 |
| Article XI | Workmen's Compensation . . . | 63 |

i

| ARTICLE | TITLE | PAGE NO. |
|---|---|---|
| Article XII | Seniority | 65 |
| Article XIII | Continuity of Service | 76 |
| Article XIV | General Provisions | 81 |
| Article XV | Leave of Absence and Military Leave | 82 |
| Article XVI | Work Contracted Outside | 86 |
| Article XVII | Grievance Procedure | 87 |
| Article XVIII | Arbitration | 92 |
| Article XIX | Wage and Shift Premium | 95 |
| Article XX | Benefits | 102 |
| Article XXI | Apprentices | 103 |
| Article XXII | Separation Pay Allowance | 105 |
| Article XXIII | No Strike Clause | 111 |
| Article XXIV | Labor Assets Management Program (LAMP) | 112 |
| Article XXV | Miscellaneous Conditions | 118 |
| Article XXVI | Authority | 138 |
| Article XXVII | Savings Clause | 139 |
| Article XXVIII | Duration | 139 |

| ARTICLE | TITLE | PAGE NO. |
|---|---|---|
| Article XXIX | Intellectual Property Agreement | 140 |
| | Signature Page | 141 |

## ATTACHMENTS

| | | |
|---|---|---|
| Attachment A | Overtime Procedure | 142 |
| Attachment B | Employees Promoted from the Bargaining Unit | 155 |
| Attachment C | 1997 Insurance, Pension and Savings Agreement | 156 |
| Attachment D | Letter, J. Hanna to G. Muth, July 18, 1997, Items for Continued Discussion- Revised | 175 |
| Attachment E | Letter, R. Burden to J. Sorensen, May 23, 1997, Appointment Time for Vision Services | 178 |
| Attachment F | Letter, J. Hanna to G. Muth, February 25, 1997, Temporary Assignments/Labor Assets Management Program | 181 |

# ATTACHMENTS (continued)

Attachment G  Letter, J. Hanna to G. Muth,
February 19, 1997, Labor
Assets Management
Program . . . . . . . . . . . . . . 183

Attachment H  Letter, J. Hanna to G. Muth,
May 22, 1997, Work
Contracted Outside . . . . . . . 185

Attachment I  Intellectual Property
Agreement  . . . . . . . . . . . . 192

Attachment J  Out of Area Coverage  . . . . . 200

Attachment K  Seniority Groups/Local
Unions  . . . . . . . . . . . . . . . 202

iv

## LABOR AGREEMENT BETWEEN

## FLUOR DANIEL HANFORD, INC.

## AND HANFORD ATOMIC METAL TRADES

## COUNCIL, AFL-CIO

This Agreement is made and entered into this seventh day of August 1997 by and between Fluor Daniel Hanford, Inc., its successors, hereinafter called "the Employer," and the Hanford Atomic Metal Trades Council, AFL-CIO, hereinafter called "the Council," and is applicable to all work done under the Project Hanford Management Contract, by the work force defined in Article I of the Collective Bargaining Agreement.

Fluor Daniel Hanford, Inc. team members and their successors also will adhere to this Collective Bargaining Agreement for work under the aforementioned Project Hanford Management Contract.  Team members include major subcontractors, subcontractors and enterprise companies.

v

# PREAMBLE

The management and integration of Project Hanford is one of the most complex and challenging undertaking in the DOE system, requiring the highest standards of safety and performance.

The parties to this agreement shall embrace a strong commitment to safety, cost-efficiencies and operational flexibility that attains results and achieves real progress in the cleanup at Project Hanford.

The parties also recognize that the successful completion of the work covered by this Agreement is essential to achieving goals mandated by the Department of Energy (DOE) Tri-Party Agreement among DOE, the Environmental Protection Agency (EPA), and the State of Washington Department of Ecology.

# ARTICLE I
## UNION RECOGNITION

1. The Employer, in the operations of all its Hanford contracts, agrees to recognize the Hanford Atomic Metal Trades Council as the sole collective bargaining representative in all matters pertaining to wages, hours, and working conditions, for all employees in the bargaining unit as defined by the National Labor Relations Board in all applicable certifications and recognitions and whom it employs at and for the Project Hanford Management Contract:

   A. Case No. 19-RC-208
   B. Case No. 19-RC-459
   C. Case No. 19-RC-1381
   D. Case No. 19-RC-1553
   E. Case No. 19-RC-1917
   F. Case No. 19-RC 2770
   G. Case No. 19-RC-3430
   H. Case No. 19-RC-5965
   I. Case No. 19-RC-7255
   J. Case No. 19-RC-6395

2. The Employer recognizes that it is the responsibility of the Council to represent the employees effectively and fairly. In the event

of any violation of the terms of this Agreement, the responsible and authorized representatives of the Council or the Employer, as the case may be, shall promptly take such affirmative action as is within their power to correct and terminate such violation.

## ARTICLE II
## MANAGEMENT RIGHTS

1. Subject only to any express limitations stated in this agreement, or in any other agreement between the Employer and the Council, the Employer retains the exclusive right to manage its business which shall include, (but not be limited to), the right to determine the methods and means by which its operations are to be carried on, to direct the workforce, and to conduct its operations in a safe and efficient manner, and the right to discipline or discharge employees for reasonable and just cause provided that the exercise of management rights shall not conflict with the provisions of this agreement, including use of the Grievance and Arbitration procedure.

2

## ARTICLE III
## UNION SECURITY/DUES CHECK-OFF/UNION REPRESENTATION

1. Payment of Union Membership Dues

   A. All employees in the bargaining unit shall, as a condition of continued employment, become a member of the appropriate union affiliated with the Council and pay union dues within thirty (30) days of date of employment.

      (1) Employees who are members of a union affiliated with the Council shall continue to pay membership dues to such union, through the Council, as a condition of employment while in the bargaining unit and on the active payroll, and while remaining a union member. Employees within the bargaining unit who become members of a union affiliated with the Council shall pay after thirty (30) days continuous service, membership dues (including initiation fee, if any) to the appropriate union through the Council, as a condition of employment while in

3

the bargaining unit and on the active payroll and while remaining a union member.  In no event shall the membership dues (including initiation fee, if any) exceed the amount specified in the Constitution and/or Bylaws of the appropriate union and uniformly required.

(a)  No employee shall be required to pay, as a condition of employment while in the bargaining unit, any union membership dues covering any period during which the employee was not in the bargaining unit or was not on the Employer's active payroll.

(b)  Any employee required to pay membership dues, or initiation fee as a condition of employment, who fails to tender the initiation fee, or periodic dues uniformly required, shall be notified in writing of his delinquency.  A copy of such communication shall be mailed by the Council to the Director Industrial Relations, not later than five (5) days prior to a request that the Employer take final action on a delinquency.

2.  **Dues Deductions**

The Employer shall deduct union membership dues (including initiation fee, if any) from the wages of an employee upon the following conditions and at the times and in the manner hereinafter provided.

A.  For employees who sign individual authorization forms, as described below, the Employer shall in accordance with such authorization, deduct from the earnings, payable to such employee, union dues (including initiation fee, if any) and promptly remit same through the Council to the appropriate union affiliated therewith.

B.  Subject to applicable law, any such authorization shall be revocable by the individual employee as

4

5

described in the form of authorization agreed to by the parties.

C. Deductions will only be made from the wages of employees who have executed and delivered to the Employer a written authorization in the agreed form.

D. Indemnity Agreement

The Council shall indemnify and save the Employer harmless against any and all claims, demands, lawsuits or other forms of liability that may arise out of or by reason of action taken by the Employer in making payroll deductions of union membership dues and/or initiation fees, as herein defined.

E. As part of the hiring process, regular full-time and temporary employees within the bargaining unit will be routed to HAMTC as part of their sign up procedure.

3. Remittance and Statement to the Council

The Employer shall furnish to the Council the following data:

A. On or before the fifteenth day of each month:

(1) The total amount of monthly dues (and initiation fees, if any) deducted from earnings payable on the first payday of the month, listed by craft.

(2) The name, payroll number and craft of, and amount contributed by, each employee from whose wages such deductions were made.

(3) The Employer shall, at the same time, forward to the Council its checks covering the amounts shown on or before the last day of each month:

6

7

(a) The total amount of such monthly dues, if any, deducted for each craft from earnings payable on paydays subsequent to the first payday of the month listed by craft.

(b) The name, payroll number and craft of, and amount contributed by each employee from whose wages such deductions were made.

(c) The Employer shall forward to the Council its checks for the appropriate amounts.

4. Union Representation

Authorized representatives of the Council shall have access to the project for the purpose of administering this Agreement, provided that such representatives fully comply with the visitor, safety and security rules established for the Hanford Site.

The Stewards shall be paid at their straight-time hourly rates for time spent processing

grievances and other related union business during their regularly scheduled working hours. It is agreed that such time shall be limited to a reasonable amount and the Council and the Employer shall jointly investigate any cases where it appears that an individual is taking an unreasonable amount of time.

Each Council affiliate shall have the right to designate Stewards as required, and the Stewards shall be recognized as the union's representative. Each designated Steward employed by the Employer shall be a qualified employee and shall perform assigned work.

Stewards will be subject to discipline to the same extent as other employees provided, however, that the Council shall be notified prior to the discharge of a Steward. Should a Steward be discharged, the union may appoint a replacement but work shall continue without disruption.

The Employer shall recognize those Stewards selected by the Council for specified locations, crafts, or classifications. All Stewards shall be selected from employees of the Hanford Project within the bargaining unit who have received proper security clearance for the areas in which

8

9

they represent employees. The Council shall give the Employer five (5) days notice of any change in Stewards.

The number of Stewards shall be established or changed by mutual agreement between the Council and Employer.

Before leaving his job, the Steward shall inform his immediate Supervisor where he wishes to go and secure permission to leave. He shall also report back to the supervisor on his return.

Stewards will not be reassigned involuntarily within a classification unless the progress of the work requires it. Every reasonable effort will be made to assign Chief Stewards (generally one from each craft affiliated with the council with such exceptions in particular cases as may be mutually agreed upon) to straight-day work. It is recognized, however, that the progress of the work may not always make this possible.

## ARTICLE IV
## NON-DISCRIMINATION

1. The Employer shall not discriminate against or coerce the employees covered by this

**10**

Agreement because of affiliated membership in or activity in behalf of the Council, nor encourage membership in any union not affiliated with the Council, nor shall it attempt to discourage any local unions from affiliated membership in the Council. It is the policy of the Employer, the Council and each of its affiliated local unions not to discriminate against any employee or applicant for employment because of race, creed, color, sex, national origin, age, religion, disability, Vietnam era veterans, union membership or affiliation, or any other basis prohibited by law.

2. The Council agrees that neither its officers nor its affiliated membership will intimidate or coerce employees.

3. Whenever the pronoun "he," or "his," or "him" appears in this Agreement, it is intended to apply to both male and female.

## ARTICLE V
## JURISDICTION

1. In the assignment of work, the Employer shall recognize the established seniority

**11**

groups and their established jurisdiction. It is agreed, however, that employees may be temporarily assigned work outside their established seniority groups in situations which leave the Employer no reasonable alternatives. Disputes regarding such assignments are subject to the grievance procedure, but the work shall be carried on as assigned pending the settlement.

2. The Employer shall not undertake the settlement of jurisdictional disputes or craft boundaries. Such disputes shall be settled by the Council in accordance with its established procedure. Upon receiving notice of a jurisdictional or craft boundary dispute the Council shall notify the Employer, by registered mail, of the nature of the dispute. The Employer will have five (5) days after receipt of the notice, to present a written position to the Council describing the impact on the Employer's operations. The Council will not permit any such dispute to interfere with the progress of the work. The Council shall give the Employer written notice fifteen (15) days prior to the settlement becoming effective. Pending the settlement of such disputes, the work shall continue on the same basis as it was

12

performed at the time the dispute arose. The Council recognizes that all jurisdictional agreements and awards entered into or rendered in accordance with the Council's regular procedures must be in the utmost good faith and not designed to promote ineffective working arrangements. The Council further recognizes it obligations to discuss such jurisdictional settlements and awards with the Employer pursuant to the contract, in good faith and with an authentic and meaningful spirit of cooperation and understanding.

3. If the Council claims that the Employer has violated a jurisdictional assignment as to Council affiliates which represent the Employer's employees, it shall provide the Employer with documents supporting the Council's official position on such assignments.

4. It is the Employer's intent to assign all regular maintenance work in engineering, research and laboratory facilities to bargaining unit personnel.

The necessities of the research and development function are such that some

13

manual work will be performed by technical or professional personnel; however, insofar as practicable, it is the Employer's intent to utilize bargaining unit craftsmen on those phases of the work which do not require performance by technical or professional personnel in furtherance of their research, study or observation. In making working assignments, the Employer will act in accordance with this statement of policy.

## ARTICLE VI
## HEALTH AND SAFETY

1.  The Employer will provide safety inspections, first aid service, and safety and radiation protection equipment to minimize accidents and health hazards to the employees at the plant during the hours of their employment. The Council agrees to cooperate with the Employer to the end that employees will use any required safety equipment when so provided and observe such safety and health regulations as prescribed by the Employer.

2.  The Employer will set up a safety committee for the Hanford Plant and employees will be asked to serve on the committee for a fixed

period of time. The Council shall designate, to serve on the committee in an advisory capacity, a number of employees equal to the number of Employer designees. The committee will meet at least once monthly. The Employer will, upon request, provide the Council minutes or reports of the safety committee meetings as prepared for distribution.

3.  The Employer will provide for periodic medical examinations of all employees. Employees may discuss their examinations with the examining doctor. All employees covered by this Agreement will comply with safety rules and regulations established by the Employer and/or DOE covering work performed under this Agreement.

4.  When an employee is involved in an industrial accident that combines both personal injury and radioactive contamination, the employee's pay is continued up to the time of his release from the 300 or other Area locations in which the employee undergoes prescribed decontamination procedure. If the employee is released from his area prior to the end of his regular shift, he is continued in a pay

14

15

status until the end of such regular shift, unless overtime premiums are involved. When in such situations the employee is directed to report to the HEHF facilities in Richland, or to Kadlec Hospital, or the whole Body Counter, he will be continued in a pay status until the end of his regular shift if he is released from the facilities mentioned above prior to the end of his regular shift or if he is working hours other than his regular shift, he will be paid at the applicable rate until such time as he is released from the facilities mentioned above, but in no event will he receive more than the equivalent of eight (8) hours pay at his straight time rate for time commencing with his leaving his area location and ending with his release from the facilities mentioned above.

5.  The parties hereto recognize the principle that radiation exposure should be held to the lowest practical level consistent with the requirements of the job and the interests of the affected employees. Consistent with this principle, the Employer will use its best efforts to ensure employees covered by this agreement are not subjected to more than three hundred (300) mrem of gamma radiation on a single occasion or during any

seven (7)-day period, nor more than three (3) rem of gamma radiation exposure annually. The Employer will use its best effort to plan and execute the work covered by this Agreement to strive to achieve as equitable a distribution of radiation exposure as practical among the employees in the classifications covered by this Agreement consistent with the requirements of the job, efficiency, and productivity.

16

17

February 28, 1997

To:      J. H. Hanna
From:    L. K. Trent

Subject: HAMTC REPRESENTED WORKER WITHIN
         THE SAFETY ORGANIZATION

A number of initiatives are being developed
within the Project Hanford Management Contract
to ensure worker involvement in the safety
process. This involvement includes worker
participation in the development of safety
program elements, review of safety issues in the
work place, participation in work activities
associated with implementation of the Voluntary
Protection Program, and implementation of the
Integrated Safety Management System.

As part of these initiatives, and as we have
discussed with the HAMTC representatives and
their President, Gary Muth, I would like to
propose a position within my organization to be
filled by a HAMTC represented worker. This job
will be included in the worker involvement noted
previously. We want to start with one employee
but we may expand it to more if this proves to be
beneficial to the organization and the workers.

The purpose of this letter is to provide the
starting point for you and Gary Muth to pursue
this idea as you feel appropriate. I want to offer
my personal commitment to this idea. I have
started a similar activity at another DOE site and
have found it to be very effective. My
Occupational Safety and Health Director, Dave
Jackson, also fully endorses this idea and has
had experience with it at another site.

Please contact me for anything more that you or
Gary need from me or Dave. We will meet with
you to work this idea as you request.

18

19

April 1, 1997

Mr. Gary L. Muth, President
Hanford Atomic Metal Trades Council
P.O. Box 898
Richland, Washington 99352

Dear Mr. Muth:

## HEALTH AND SAFETY COMMITMENT

Fluor Daniel Hanford, Inc. (FDH) is committed to partner with the Hanford Atomic Metal Trades Council (HAMTC) in the area of health and safety. Worker protection is the common ground that FDH and HAMTC agree to work together for the betterment of Project Hanford and the workplace.

A key to this partnership is worker involvement at a level that inspires ownership of the site safety program. This ownership will be built through active participation in safety-related issues. HAMTC will review existing committees and place appropriate labor participants on these committees. As the parties progress in the development of a single site safety program, HAMTC will provide employee representatives at various meetings and working groups to provide valuable field input and worker perspectives. During times of incidents, investigations, and major assessment activities, FDH and the major subcontractors (MSC) will include HAMTC's safety representatives. The arrangement for HAMTC participation on all committees will be through the Council President.

FDH and the major subcontractors recognize the value of employee-based natural work groups and foster a communication and input process into safety-related issues at all levels in the organization. FDH and the MSCs will work to ensure every employee has an avenue to provide input into the safety program. As part of the Presidents' Zero Accident Council, the bargaining unit representatives participate as the subcontractors' employee safety representatives. The employee safety representatives are members of MSC Company Zero Accident Councils. These company/employee councils are formed from Employee Safety Advocates from Facilities or Area Zero Accident Councils. The Facility/Area Zero Accident Councils are made up of members of the natural work groups (bargaining and nonbargaining). This structure for Zero Accident Councils ensures free communication through Employee Safety Advocates and the

20

21

ability to partner with management at all levels in the organization to identify and resolve safety issues. Through the network of Employee Safety Advocates, the ability of every employee's safety concern to be heard at the appropriate level in the organization is maintained.

FDH and the MSCs also commit to working with HAMTC to define involving the workforce in the evaluation of work hazards using the Job Hazards Analysis tools, evaluations of the workplace, and input on the development of workplace safety policies, rules, and procedures.

Very truly yours,

J. H. Hanna, Director
Industrial Relations

22

## ARTICLE VII
## HOURS OF WORK AND SHIFTS

Employees are classified as either:

A.   Straight-day workers, or

B.   Shift workers.

2.   The standard hours of work and schedules are as follows:

A.   Straight Day Schedule:

Employees scheduled to work Monday through Friday. The hours of work are as follows:

6:00 a.m. to 2:30 p.m.
30 Minute Lunch

6:30 a.m. to 3:00 p.m.
30 Minute Lunch

7:00 a.m. to 3:30 p.m.
30 Minute Lunch

7:30 a.m. to 4:00 p.m.
30 Minute Lunch

23

7:45 a.m. to 4:30 p.m.
45 Minute Lunch

8:00 a.m. to 4:30 p.m.
30 Minute Lunch

B.    Rotating Schedule - 28 Day Rotation (A, B, C, D) Seven Days:

Employees scheduled to rotate between days, graveyard, and swing shift to provide coverage twenty-four (24) hours per day, seven (7) days per week. The hours for these shifts are as follows:

Days:        7:30 a.m. to 4:00 p.m.
             30 Minute Lunch

Swing:       3:30 p.m. to 12:00 Midnight
             30 Minute Lunch

Graveyard:   11:30 p.m. to 8:00 a.m.
             30 Minute Lunch

C.    Rotating Schedule (X, Y, Z) Five Days:

Employees scheduled to rotate between days, graveyard and swing shift to provide coverage twenty-four hours per day, Monday

through Friday. The hours for these shifts are as follows:

Days:        7:30 a.m. to 4:00 p.m.
             30 Minute Lunch

Swing:       3:30 p.m. to 12:00 Midnight
             30 Minute Lunch

Graveyard:   11:30 p.m. to 8:00 a.m.
             30 Minute Lunch

D.    Modified Rotating Schedule (P-Q) Five Days:

Employees scheduled to rotate between days and swing shift to provide coverage sixteen (16) hours per day, Monday through Friday. The hours for these shifts are as follows:

Days:   7:30 a.m. to 4:00 p.m.
        30 Minute Lunch

Swing:  3:30 p.m. to 12:00 Midnight
        30 Minute Lunch

E.    The following shifts require mutual agreement between Employer and the Council before implementation. Should

24                                                                      25

either party wish to discontinue the shift, two weeks notice is required.

1. **Modified Rotating Shift - 35 Day Rotation (A, B, C, D, E) Seven Days:**

Employees scheduled to rotate between days, graveyard and swing shift to provide coverage twenty-four (24) hours per day, seven (7) days per week. The hours for these shifts are as follows:

Days:       7:30 a.m. to 4:00 p.m.
            30 Minute Lunch

Swing:      3:30 p.m. to 12:00 Midnight
            30 Minute Lunch

Graveyard: 11:30 p.m. to 8:00 a.m.
            30 Minute Lunch

The A, B, C, D, E shift will provide two (2) shifts each week and will result in a thirty-five (35) day rotation rather than a twenty-eight (28) day rotation.

26

2. **4/10 Shift Schedule:**

A 4/10 shift schedule, if utilized, will be established as follows:

The first 4/10 shift shall start between the hours of 6:00 a.m. and 8:00 a.m., and the second 4/10 shift shall start between the hours of 4:30 p.m. and 6:30 p.m. Both shifts will include a one-half (1/2) hour of unpaid lunch period per shift. Forty (40) hours per week shall constitute a weeks work, Monday through Thursday. Straight time is not to exceed ten (10) hours a day or forty (40) hours per week. Starting time will be designated by the Employer; the Union will be advised of the starting time. Staggered starting times may be established for various work operations.

3. **Twelve Hour Shift Schedule**

A 12 hour shift schedule will be established as follows:

The shift shall start between 5:30 a.m. and 7:00 a.m. The shift will include a

27

one-half (1/2) hour of unpaid lunch period per shift. For purposes of the 12 hour shift, employees shall be assigned either to A, B, C or D shift. Starting time will be designated by the Employer; the Union will be advised of the starting time.

3. A "Straight Day" employee is one who is regularly scheduled to start work after 6:00 a.m. and end work before 6:00 p.m. exclusive of overtime. A "Straight Day" employee normally works Monday through Friday, but this may vary. Such shift variations made effective subsequent to the effective date of the Agreement are subject to the provisions of Section 5 below.

4. Certain employees such as Stationary Operating Engineers (SOE's) work eight (8) hours per shift, including lunch period.

5. All new special shifts and schedules will be negotiated with the Council. It is specifically understood and agreed that the Council will not arbitrarily or unreasonably withhold its ratification of, or concurrence with special shifts and schedules established or proposed by the Company.

6. Unusual conditions may require the employees be assigned for a temporary period to a standard shift which does not rotate or to standard shifts not rotating more than once a week. Such assignments do not constitute shift changes which require negotiations with the Council, provided advance notice of at least forty-eight (48) hours is given to the employees involved. Employees will not receive more than one notice of shift change in any forty-eight (48) hour period. Except in cases where an employee may be assigned to substitute temporarily for an absent employee, a change in shift assignment will be for a minimum of one work week in duration. The return of an employee to his regular shift after temporarily substituting for an absent employee shall not constitute a shift change for purposes of this Article.

7. Employees who are instructed by supervision to work shifts not established by the provisions of this Agreement and not hereafter agreed to by the Council, where required, will be paid time and one-half (1-1/2) for such hours worked. Any claim for payment of said premium pay must be made

in writing by the Council within twenty (20) days from the day of the commencement of the new shift or no premium payment will be made.

8. An employee will be given a forty-eight (48) hour notice of any change of shift assignment. Failure to receive the forty-eight (48) hours notice will entitle the employee to payment at the applicable overtime rate for all hours worked on the new shift during said forty-eight (48) hour period.

9. Employees shall be paid for time actually worked computed to the nearest one-tenth (1/10) hour.

10. If work requirements do not permit the scheduling of a lunch period within approximately one (1) hour before or after the middle of the shift, no lunch period as such will be scheduled and payment will be made for all hours worked.

11. It is the intent of the Employer to maintain a work force consistent with scheduled requirements. Under such conditions, every effort will be made to provide regular employment before work is contracted outside.

12. Special Shifts:

Certain groups of employees are on special shifts not described in this Article. Such special shifts and schedules will continue to be assigned to these groups and may also be assigned to other groups. Such new assignments will be negotiated with the Council in accordance with Section 5, of this Article.

13. Establishment of Shifts and Temporary Shift Assignments:

A. The Employer may continue under the provisions of Section 6, to assign employees on a temporary basis (60 days) to standard shifts which do not rotate, or that do not rotate more than once per week, and which include segments of rotating shifts.

B. Generally, temporary shift assignments will be made based on the following:

30

31

1. **Volunteers**

2. **Lacking volunteers, the least senior person within the work group will normally be assigned.**

**It is recognized that the health and safety of the employees, the progress of the work, certification, security clearances, work restriction, radiation exposure, training and qualification, may preclude rigid adherence to the least senior person being assigned.**

**It is not the intent of the Employer to use Section 13 referenced above, to unreasonably limit adequate training for our employees to meet the needs of the PHMC.**

**The assignments described in A and B above do not constitute a non-sanctioned shift, and do not require negotiations with the Council prior to implementation; provided the proper advance is given to the employee.**

32

April 4, 1997

Mr. G. L. Muth, President
Hanford Atomic Metal Trades Council
P. O. Box 898
Richland, WA  99352

Dear Mr. Muth:

**TEN (10) AND TWELVE (12) HOUR SHIFTS**

**This letter confirms that the parties have agreed to defer the further development of details of 10 and 12 hour shifts until after the current contract negotiations have been completed. Beginning when the new agreement is ratified by HAMTC, there will be a six (6) month period to develop such details. If there is no agreement on either of the shifts within that time frame, the shifts(s) not agreed will be dropped from further consideration unless both parties agree to extend the six (6) month time period.**

**It is agreed that negotiations on the 10 and 12 hour shifts shall be coordinated by the Company through the Council President.**

33

The Council may indicate its concurrence with this agreement by signing and returning one copy of this letter to my office.

Very truly yours,

J. H. Hanna, Director
Industrial Relations

Concurrence:  s/Gary L Muth    4-1-97
              HAMTC          Date

## ARTICLE VIII
## OVERTIME AND PREMIUM RATES

1. **Work day**

   For purposes of determining overtime hours worked, an employee's work day begins when the employee starts work and ends twenty-four (24) hours later.

2. **Work week**

   For purposes of determining overtime hours worked, an employee's work week begins at a fixed time each week based on the employee's working schedule and ends one-hundred-sixty-eight (168) hours later.

3. **Overtime will be paid as follows for employees who normally work an eight (8) hour shift.**

   A. Time and one-half (1-1/2) will be paid for hours worked in excess of eight (8) hours in a single work day.

   B. Work in excess of twelve (12) hours in an employee's work day even during shift work:

(1) Double time will be paid for all hours worked in excess of twelve (12) hours in a single work day.

(2) Double time will be paid an employee for work performed beyond the end of his work day, during which he shall have worked in excess of twelve (12) hours as described in (1) above, if he has not been away from work for at least six (6) consecutive hours before the start of his last assignment in that work day.

(3) Double time will be paid an employee for work performed beyond the end of his work day during which he shall have worked in excess of twelve (12) hours as described in (1) above, if he has not been away from work for at least six (6) consecutive hours before the start of his next work day.

**C.  Work During First Scheduled Day of Rest**

Time and one-half (1-1/2) will be paid for hours worked on the employee's first scheduled day of rest within his regular work week. Employees on their four (4) day rest will have the first and third day considered as the first scheduled day of rest.

**D.  Work During Second Scheduled Day of Rest**

Double time will be paid for hours worked on the employee's second scheduled day of rest within his regular work week. Employees on their four (4) day rest will have the second and fourth day considered as the second scheduled day of rest.

4.  Overtime will be paid as follows for employees who normally work a ten (10) hour shift:

**A.  Time-and-one-half (1-1/2) will be paid for hours worked in excess of ten (10) hours in a single workday.**

**B.  Work in Excess of Fifteen (15) Hours in a Work Day**

Double time will be paid for all hours worked in excess of Fifteen (15) hours in an employee's work day.

36

37

Double time will be paid an employee for work performed beyond the end of his work day, during which he shall have worked in excess of fifteen (15) hours as described above, if he has not been away from work for at least six (6) consecutive hours before the start of his last assignment in that work day.

Double time will be paid an employee for work performed beyond the end of his work day during which he shall have worked in excess of fifteen (15) hours as described above, if he has not been away from work for at least six (6) consecutive hours before the start of his next work day.

C.  Time-and-one-half (1-1/2) will be paid for hours worked on the employee's first scheduled day of rest within his regular workweek unless such work is in excess of fifteen (15) hours in the workday which is paid at double (2) time.

Time-and-one-half will be paid for hours worked on the employee's second scheduled day of rest within his regular workweek unless such work is in excess of ten (10)

hours in the workday which is paid at double time.

Double time will be paid for hours worked on the employee's third scheduled day of rest.

5.  Overtime will be paid as follows for employees who normally work a twelve (12) hours shift:

A.  Time-and-one-half (1-1/2) will be paid for hours in excess of forty (40) hours in the work week.

B.  Double time will be paid for all hours worked in excess of fourteen (14) hours in an employees work day.

C.  There are no first or second days of rest to determine any special overtime premiums, only days off.

6.  Call-in Pay

A.  Call-in time differs from scheduled overtime in that the employee does not receive at least sixteen (16) hours advance notice.  It is the result of an

38

39

emergency condition that occurs outside the employee's regular scheduled hours and which could not be anticipated.

B.  Call-in time shall begin when the employee is picked up at the Richland or perimeter barricade by transportation arranged for by the Employer and ends when he has been returned to the point of pickup. Employees who are called in and instructed to report at a specific location at a definite time, and who do report as instructed, will be paid from the time they report. If regular transportation to the work area is available, it may be determined by supervision that special transportation would not be necessary. In such a case, the employee will be paid in accordance with established time scheduled for transporting employees to and from Richland.

C.  Under no circumstances will an employee receive payment from the Employer while utilizing a privately-owned vehicle during a call-in period.

40

D.  For hours worked during the period commencing at 7:30 a.m. and ending at 11:30 p.m., call-in payment will be at the applicable overtime rate but will not be less than time and one-half (1-1/2).

E.  For hours worked during the period commencing at 11:30 p.m. and ending at 7:30 a.m., call-in payment will be at the rate of double time.

F.  Employees who are called in as provided herein will receive not less than the equivalent of four (4) hours pay at their straight-time rate.

G.  Call-in payments are applicable only to work performed outside an employee's regular schedule and will not be made to employees for work performed during their regular schedule.

7.  Scheduled Overtime Pay

A.  Scheduled overtime differs from call-in time in that the work is scheduled in advance and the employee is given notice accordingly.

41

B.  Employees who are required to work scheduled overtime will receive at least sixteen (16) hours definite notice except in extremely unusual cases.

C.  Scheduled overtime shall begin when an employee reports to work and ends when he has been relieved. If transportation arranged for by the Employer is required and is not immediately available, the scheduled overtime will continue until he is picked up.

D.  Employees who are scheduled to start work prior to the starting time of their regular schedule and who thereafter complete their regular schedule will be paid at the applicable overtime rate from the time they report to work until the starting time of their regular schedule.

E.  Employees who work scheduled overtime after completing their regular schedule shall be paid at the applicable overtime rate for hours worked in addition to their regular schedule.

F.  Employees reporting for scheduled overtime work will be provided with transportation from the bus lot if required, and regular transportation to the work area is not available and personal transportation is not used.

8.  Hold-Over Pay

A.  Employees who are held over after working through their regular schedule shall be paid at the applicable overtime rate for hours worked in addition to their regular schedule.

B.  Hold-over time shall end when the employee is relieved of his job responsibility. If transportation is required and is not immediately available, the hold-over time will continue until he is picked up.

9.  Reporting Time Pay

Employees who are sent home for lack of work after reporting in accordance with their regular schedule or in accordance with

instructions from their supervision will receive not less than the equivalent of four (4) hours pay at their straight-time rates.

### 10. Canceled Overtime Pay

Employees who are given firm notice to report for call-in or scheduled overtime shall receive an amount equivalent to two (2) hours pay at their straight-time rate if such notice is canceled after they have completed their last regular schedule prior to starting time of such overtime assignment. Employees will likewise be expected to fulfill their overtime commitments.

### 11. Counting Overtime Hours

Overtime hours, either daily or weekly, shall be counted once only in determining overtime premium. There shall be no compounding, duplicating or pyramiding for the same hours worked under any circumstances of any description.

### 12. Maximum Overtime Rate

Under no combination of circumstances except as described in Section 13, Work on a

Facility Closure Day; Section 6, Call-In Pay; Section 9, Reporting Time Pay; Section 10, Canceled Overtime Pay shall the total compensation to an employee exceed two (2) times the straight time rate.

### 13. Work on a Facility Closure Day

For work during a Facility Closure Day, payment will be as follows:

A.  For work during his regular schedule, time-and-one-half (1 1/2 X).

B.  For work outside his regular schedule, double time (2 X).

C.  In addition, the employee may elect to draw pay from his TOWP account for the number of hours that are in his regular schedule, i.e., 8, 10, or 12 hours.

14. When an employee uses TOWP during his/her regular workday, the TOWP hours will be counted as hours worked for the purposes of determining overtime premium eligibility for that workday.

44

45

## *ARTICLE IX*
## TIME OFF WITH PAY

**1. Policy**

Time Off With Pay (TOWP) is provided to eligible employees for leisure time off, personal time off, facility closure days, time lost from work due to illness or injury, family emergencies or medical/dental appointments.

**2. Definitions**

    **A. Eligible Employee:** Regular full-time and part-time HAMTC-represented employees

    **B. TOWP Pay:** Hours taken as time off will be paid at the employee's base salary rate

    **C. Composition of TOWP: V - Accrual based** on years of service

| | |
|---|---|
| 0-5 | = 80 hours per year |
| >5 | = 120 hours per year |
| >10 | = 160 hours per year |
| >20 | = 200 hours per year |

          FCD - 80 hours

          o   72 hours designated as facility closure days
          o   8 hours designated by employee as floater

          S/E - 56 hours

**3. Procedure**

    **A.** Transition from the existing salary continuance program to the TOWP program will be effective January 1, 1998.

        1. TOWP will be front loaded with 56 hours on January 1, 1998.

        2. TOWP will be front loaded with 56 hours on January 1, 1999.

    **B.** Benefit Accrual

        1. The first facility closure day, although paid and observed on January 1, 1998, is not included in the 1998 TOWP accrual.

2.  **Effective January 1, 1998 Time Off With Pay is accrued as follows:**

    a.  An employee earns 2.92 hours per week (152 hours per year) during the first five years of continuous service.

    b.  An employee earns 3.69 hours per week (192 hours per year) beginning on the sixth through tenth year of continuous service.

    c.  An employee earns 4.46 hours per week (232 hours per year) beginning on the eleventh through twentieth year of continuous service.

    d.  An employee earns 5.23 hours per week (272 hours per year) beginning on the twenty-first year of continuous service and each year thereafter.

3.  **Effective January 1, 1999 Time Off With Pay is accrued as follows:**

48

    a.  An employee earns 3.08 hours per week (160 hours per year) during the first five years of continuous service.

    b.  An employee earns 3.85 hours per week (200 hours per year) beginning on the sixth through tenth year of continuous service.

    c.  An employee earns 4.61 hours per week (240 hours per year) beginning on the eleventh through twentieth year of continuous service.

    d.  An employee earns 5.38 hours per week (280 hours per year) beginning on the twenty-first year of continuous service and each year thereafter.

4.  **Effective January 1, 2000 Time Off With Pay is accrued as follows:**

    a.  An employee earns 4.15 hours per week (216 hours per year) during the first five years of continuous service.

49

b. An employee earns 4.92 hours per week (256 hours per year) beginning on the sixth through tenth year of continuous service.

c. An employee earns 5.69 hours per week (296 hours per year) beginning on the eleventh through twentieth year of continuous service.

d. An employee earns 6.46 hours per week (336 hours per year) annually beginning on the twenty-first year of continuous service and each year thereafter.

5. Time Off With Pay is accrued when an employee receives pay from the employer for:

a. Days worked.

b. Days taken as TOWP.

c. When an employee takes time off without pay, but for no more than ten (10) consecutive working days.

6. TOWP is accrued by the employee only while on regular full-time or part-time status. When an employee's status changes from temporary to full-time with no break in continuous service, the date of hire as a temporary employee determines the employee's TOWP accrual rate.

7. An employee may accumulate up to a maximum number of TOWP hours as follows:

a. In 1998, 720 hours.

b. In 1999, 800 hours.

c. In 2000, 900 hours.

d. In 2001, 1000 hours.

C. Facility Closure Days

1. Fluor Daniel Hanford, Inc. will be closed nine (9) days, except for essential employees.

The facility closure days listed in Section 2.B.1 of this article shall be

observed on the days on which they fall, except that when any of these facility closure days fall on the first scheduled day of rest of an employee, it shall be observed by that employee on his last preceding regularly scheduled workday which is not an observed facility closure day.  If the facility closure day falls on the second scheduled day of rest of an employee, it shall be observed by that employee on his next succeeding regularly scheduled workday which is not an observed facility closure day. To receive pay, employees must charge to their TOWP account.

Employees who would have received shift differential, if they had worked, will have that amount added.

When two facility closure days fall within a period of four (4) consecutive calendar days and also coincide with an employee's days of rest, the above procedure shall be administered as follows:

a.  When the second facility closure day falls on an employee's first day of rest, the employee shall observe the facility closure day on the regularly-scheduled workday preceding the first facility closure day.

b.  When the first facility closure day falls on an employee's second day of rest, the employee shall observe the facility closure day on the regularly scheduled workday following the second facility closure day.

2.  The nine facility closure days are:

a.  New Year's Day

b.  Washington's Birthday*

c.  Memorial Day*

d.  July 4th

e. Labor Day

f. Thanksgiving Day

g. Friday after Thanksgiving

h. December 24th

i. Christmas Day

*These days will be observed on the day specified by Federal Law.

**D. Disability (Short-Term)**

The Company will provide the following Short Term Disability program:

1. A Short Term Disability insurance plan which pays benefits for absences due to disability which will be equal to 65% of the employee's base pay rate which is in effect on the date the disability begins. STD payments begin on the 8th calendar day of disability and can continue through the 180th day of disability.

2. Employees who are on the active rolls on January 1, 1998 will be eligible

for Company-paid salary continuance which can be used to supplement STD payments up to 100% of base pay. Employees added to the active rolls on or after January 1, 1998 will not have salary continuance available to them.

Salary continuance can be used only to supplement approved Short Term Disability payments and cannot be used for other purposes. Unused salary continuance cannot be cashed out at any time.

The amount of salary continuance available will be determined based on the employee's service as of January 1, 1998 as follows:

a. Twenty (20) days for the employee's first full year of service plus 2 days for each full year of service thereafter through December 31, 1997.

b. There will be no further accumulation of salary continuance days after December

31, 1997. Salary continuance hours used after that date to supplement STD will not be restored.

3. TOWP can be used to supplement STD payments to 100% of pay.

4. Medical, dental and life insurance benefits can continue during the short term disability period provided the employee continues to pay the required employee premiums.

E. TOWP Policy Guidelines

1. Normally, TOWP time off is approved in advance by the employee's supervisor. In the case of absences due to accident, illness or emergencies, notification of supervisors is required as soon as possible.

2. The granting of single day or less TOWP will be accomplished on the basis that additional payroll premiums or operating costs will not be incurred.

3. The progress of the work must be considered in granting TOWP periods. This consideration may result in limiting the number of personnel in a crew or shift that can be off at one time.

4. Except as herein provided, seniority will prevail in the selection process for TOWP periods as outlined below.

   a. At the start of the calendar year the TOWP schedule will be circulated in accordance with seniority. At least one (1) full week, which may include plant closure days, must be scheduled as a block at this time.

   b. After the initial scheduling, the TOWP schedule will again be circulated, in seniority order, to reserve no more than three (3) TOWP periods of less than one (1) week.

   c. After the second circulation, employees may schedule their remaining TOWP days in single

day or less increments on a first come first served basis.

5. To assure firm commitments and barring unforeseen emergencies, the scheduling of at least one (1) week of TOWP and the three (3) TOWP periods detailed in 4(a) and 4(b) must be completed by March 1st.

6. If an individual wishes to change his scheduled TOWP period, the normal procedure will be to wait until all other personnel have chosen their periods and then reschedule. However, in case of undue hardship, the employee should state the facts on a "DSI" to his foreman and consideration will be given to working out an alternate solution.

7. For employees that work shifts, the one (1) week or more of TOWP may be scheduled to correspond to their appropriate shift schedule.

8. On an individual basis exceptions may be allowed so as to permit employees to use all of their TOWP as

split TOWP days. Such exceptions will be considered only in cases of undue hardship.

F. The employer may require that TOWP for illness or accidents be supported by proper medical evidence.

G. Return to Work after Time Off with Pay Due to Illness or Injury

1. An employee whose illness or injury requires hospitalization, or lasts five (5) consecutive calendar days, cannot return to work without a work clearance from Hanford Environmental Health Foundation.

H. Time Off with Pay Upon Termination

1. An employee will be paid in a lump sum at base salary rate for all unused TOWP accrued through the day of termination.

2. The effective date of termination cannot be extended through the use of accrued TOWP hours.

58                                                                59

**I.    Time Off with Pay Upon Leave of Absence**

1.  Prior to a leave of absence, the employee may take a partial cash out or a total cash out down to a zero (0) balance. Remaining accrued hours will be frozen. Hours in frozen accounts cannot be used during the leave; however, the remaining hours may be cashed out once to a zero (0) balance. The cash out rate while on leave will be the employee's base salary rate immediately prior to the leave.

2.  TOWP hours are not earned during the leave period. Hours will begin accruing on the day the employee returns to work full time.

3.  TOWP hours may be used to supplement short term disability benefits up to 100% of the full pay rate.

4.  The effective date of a leave will not be extended through the use of accrued TOWP hours.

60

**J.    Time Off With Pay Cash Out**

During periods of continuous service, eligible employees may request partial cash out of accrued TOWP hours.

1.  Employees will be allowed one cash out in a calendar year, except in those cases when the employee is terminating.

2.  Employees may request a cash out of accumulated TOWP; however, a reserve of at least one hundred twenty (120) hours must remain in the TOWP account.

3.  Maximum cash out per calendar year is as follows:

    a.  In 1998, 40 hours.

    b.  In 1999, 80 hours.

    c.  In 2000 and thereafter, 120 hours.

61

4. The rate of cash out will be at the base salary at the time of cash out. Cash out will be in increments of one hour.

5. FDH is reviewing the administrative process to implement the 401(a) plan option.

## ARTICLE X
## JOINT LABOR MANAGEMENT COMMITTEE

1. The parties to this agreement hereby recognize the necessity of communication and the elimination of disputes, misunderstandings, or applications of this agreement that seriously impact the continuity of projects. To secure this end, it is hereby agreed that a Joint Labor Management Committee shall be established to be composed of the Employer and the HAMTC, which shall meet as required and as mutually agreed. They shall bring up any practice which, in their opinion might lead to misunderstandings or disputes between the signatory parties.

2. The Director of Industrial Relations and the President of the HAMTC shall jointly chair the Joint Labor Management Committee. The Employer and the HAMTC shall jointly coordinate Joint Labor Management Committee activities, develop procedures of operation, publish meeting agendas and issue minutes of each meeting. These meetings shall be held for discussion of various topics as they arise consistent with this agreement.

3. The Joint Labor Management Committee shall not have the authority to modify, alter, amend or interpret the provisions of this agreement.

## ARTICLE XI
## WORKMEN'S COMPENSATION

1. An employee who is out because of injury or occupational disease that is compensable under Workmen's Compensation statues of the State of Washington, and is within the comprehension of the Employer Long Term Disability Insurance Plan shall be paid an amount equal to the difference between the forty (40) hour weekly salary he otherwise

would have received, and t  ayments that he receives from Workmen's Compensation until;

A. the first one-hundred-eighty (180) days he is out have elapsed or

B. until such time as the disability payments are terminated by an order of the Department of Labor and Industries or by an order of the Superior Court, whichever of the above items (A) or (B) first occurs.

In the event that a decision of the Department of Labor and Industries, or of the Superior Court, is appealed by either the Employer or the employee, payment of said difference shall not be made unless and until a final determination is made in favor of the employee by the appropriate agency or court, but in no event shall payment be made beyond the first one-hundred-eighty (180) days such employee is out. No shift differential will be included in computing weekly salary.

In the event an employee is out because of injury or occupational disease that is

compensable under Workmen's Compensation statues of the State of Washington, but is not within the comprehension of the Employer Long Term Disability Insurance Plan, he shall be paid an amount equal to the difference between the forty (40) hour weekly salary he otherwise would have received, and the payments that he receives from Workmen's Compensation until such time as the disability payments are terminated by an order of the Department of Labor and Industries, or by an order of the Superior Court. In the event that a decision of the Department of Labor and Industries, or of the Superior court, is appealed by either the Employer or the employee, payment of said difference shall not be made unless and until a final determination is made in favor of the employee by the appropriate agency or court. No shift differential will be included in computing weekly salary.

## ARTICLE XII
## SENIORITY

1. HAMTC represented employees who have accumulated seniority with BHI, THI, WHC,

KEH, or BCSR will continu___ accumulate and retain accrued seniority upon being assigned to FDH.

2. Employees shall be listed in seniority groups as mutually agreed upon by the Council and the Employer. As new employees are hired, they will be placed in their respective groups. The seniority groups and the classifications in the various seniority groups are set forth in Appendix A (See Article XIX).

3. Force reduction and rehiring will be made only within each classification on the basis of seniority and ability to do the available work. If reductions in force are made, employees scheduled for layoff in each group may elect, on the basis of their seniority and subject to the conditions set forth in Appendix A, to take work, if available, in a lower rated classification within their own seniority group and those with the least seniority will be laid off.

4. Employees who are unable to perform work of their classification because of temporary or permanent physical disability as determined by the occupational medical group service of the Hanford Plant may,

subjec___ the conditions set forth in Appendix A, elect on the basis of seniority to take work, if available, in a lower rated classification within their own seniority group and those with the least seniority will be laid off, if necessary. Such temporarily or permanently disabled employees must be qualified to perform the available work and must meet the physical requirements of such jobs as determined by the occupational medical group serving the Hanford Plant.

5. In times of layoff, employees may not claim jobs in a higher rated classification within their own seniority group on the basis of seniority.

6. Seniority will be a major factor in upgrading to a higher classification in a seniority group, but ability will be given consideration as the employee must be qualified to do the available work. Seniority and continuous service, as defined in Article XIII, do not apply to promotions to jobs outside the bargaining unit. For non-supervisory jobs, continuous service will be a major factor when considering bargaining unit candidates if all other qualifications are equal.

7. Employees in any seniority     up who wish to be reassigned to another classification in a different seniority group may file their request with Industrial Relations and, as openings occur, they will be given consideration on the basis of their continuous service. Applicants for such reassignments must have satisfactory qualifications. The seniority of an employee so reassigned will continue in his former seniority group for a period of twelve (12) weeks, exclusive of any time he might be off the active payroll, unless he was reassigned due to a force reduction in his former classification, in which case the provisions of Section twelve (12)A of this Article will apply. During the twelve (12) week period, the reassigned employee may be returned to his former classification or a lower classification in his former seniority group, depending on his seniority in his former seniority group at the time if,

   A. The Employer finds the employee is not making satisfactory progress in his new classification; or

   B. The Employee requests that he be returned to his former seniority group.

If the e_. ,.oyee is retained in the new classification beyond such twelve (12) week period, his seniority in his former seniority group shall be extinguished. In cases where the employee has been reassigned to a different seniority group, and remains in the new classification for more than twelve (12) weeks, his seniority in the new seniority group shall be the date of reassignment. Employees, except for those affected by a reduction of force, will not be considered for such reassignment more than once in a twelve (12) month period.

8. Employees new to the bargaining unit shall be considered probationary employees for a period of ninety (90) working days exclusive of time they might be off the active payroll, during which time they will acquire no seniority credit; however, at the end of such period, if retained, they shall be placed on the seniority list and their seniority shall start from their date of assignment to the bargaining unit. The Council may represent such employees during the probationary period.

9. Employees who are promoted from the bargaining unit will continue to accumulate

seniority in their former seniority group for a period of six (6) months during which period the Employer may send them back if they do not make satisfactory progress, or the employees may, during the six (6) month period, elect to return to their former seniority group (provided their seniority would entitle them to jobs in their former seniority group). If neither the Employer nor the employee elects to exercise this six (6) months' option, the seniority of the employee shall be extinguished. The issue of whether six (6) months will be accumulative or successive, and deviations from the time limit will be subject to Appendix A discussions.

10. The rights granted by Section nine (9) shall terminate for individuals who leave the employ of the Employer at the Hanford Plant.

11. Rehiring following a reduction of force shall be in the reverse order of layoff. Employees offered re-employment shall be notified by certified or registered letter, return receipt requested, and mailed to the last address on record in the Employer's Employment Office. If the employee does not report or give

satisfactory explanation within two (2) weeks, seniority will be extinguished.

12. A.    Seniority shall accumulate for periods not exceeding eighteen (18) months for employees having less than ten (10) years continuous service and not exceeding twenty-four (24) months for employees having ten (10) or more years continuous service, for absence due to reduction of force.

B.    Seniority shall accumulate for periods not exceeding eighteen (18) months for absences due to:

(1)  Illness or

(2)  Leave of Absence

C.    At the expiration of the applicable period, seniority shall be extinguished. Individuals subsequently re-employed shall have no starting seniority.

D.    Seniority shall accumulate for periods not exceeding seventy-two (72) months for absences due to:

1. Act as a Council Officer for the HAMTC.

2. Act as a representative of any of the local unions composed at least in part of the Employer's employees and which are affiliates of the HAMTC.

13. Employees who have accepted a different job following their removal from their former classification and seniority group due to a force reduction shall accumulate seniority in their former craft or classification for a period not to exceed eighteen (18) months for employees having less than ten (10) years continuous service and not exceeding twenty-four (24) months for employees having ten (10) or more years continuous service. At the expiration of the applicable period, their seniority in their former craft or classification may be extinguished.

14. Employees within a single seniority group with multiple classifications who have elected to bump down to a lower classification within their seniority group shall not have their seniority extinguished. There are no time limits on movement back to their former classification.

15. Employees who return from leave of absence will be given re-employment on the basis of their accumulated seniority provided that reductions in force have not removed all employees with equal or less seniority in their seniority group. Reinstatement will be in their former seniority group at the going rate at the time of their return.

16. Seniority shall accumulate, as provided by Federal Laws, for absences due to Military Service.

17. Notwithstanding anything herein to the contrary, an employee may retire at his or her option as provided in the Amended Hanford Contractors Multi-Employer Defined Benefit Pension Plan for Council Represented Employees.

18. This Agreement shall continue to be applicable to retired employees who may be returned to active employment at the Hanford Plant on a temporary basis.

19. Employees with Identical Seniority Dates

When employees have identical seniority dates, continuity of service will serve to

break "ties" in seniority date, and the "senior" employee will be the one with the earliest continuity of service date.

In cases where a "tie" continues to exist after the application of the continuity of service principle, the "senior" employee will be the one with the earliest birth date.

20. **Restoration of Seniority**

Notwithstanding the provisions of Section 12 (b) and (c), should an individual be returned by the Employer to his former classification from Long-Term Disability under the provisions of the Employer's insurance plan, such individual will be credited with his full seniority, as determined by the rules set forth in the above sections of this Article.

February 20, 1997

### MEMORANDUM OF UNDERSTANDING

Sitewide seniority will continue with the PHMC, BHI and THI employees in established seniority groups in their respective Agreements with HAMTC. Employees may utilize their rights under the terms and conditions of all seniority provisions of this Agreement between FDH/HAMTC and the 1995 Agreement between BHI/THI/HAMTC whether they work for BHI, THI, or the PHMC and provided they are qualified to do the work.

s/ J. H. Hanna
James H. Hanna,
Director
Industiral Relations
Fluor Daniel Hanford,
Inc.

s/ John R. Monrean
John R. Monrean,
Manager
Labor Relations
Bechtel Hanford, Inc.

s/ John D. Moroney III
John D. Moroney, III,
President
Thermo Hanford, Inc.

s/ Gary L. Muth
Gary L. Muth, President
Hanford Atomic Metal
Trades Council

74

75

## ARTICLE XIII
## CONTINUITY OF SERVICE

1.  HAMTC represented employees who have accrued service credits with BHI, THI, WHC, KEH, BCSR will continue to accrue service credits upon being assigned to FDH.

2.  Definition of Terms

    A.  "Continuity of Service" designates the status of an employee who has service credits totaling fifty-two (52) or more weeks.

    B.  "Service Credits" are credits for periods during which the employee is actually at work for the Hanford Plant or for periods of absence for which credit is granted.  (As provided in Section 4.)

    C.  "Absence" is the period an employee is absent from work either with or without pay (except a paid vacation period), computed by subtracting the date following the last day worked from the date the employee returns to work. Each separate continuous period away

from work shall be treated as a single absence from work.

    D.  "Illness" shall include pregnancy.

    E.  "Continuous Service" designates the length of each employee's continuity of service and shall equal the total service credits of an employee who has "continuity of service".

3.  Loss of Service Credits and Continuity of Service

    Service credits previously accumulated and continuity of service, if any, will be lost whenever the employee:

    A.  Quits, resigns, or is discharged.

    B.  Is absent from work because of no call or no show for more than seven (7) consecutive days without satisfactory explanation.

    C.  Is absent from work because of personal illness or accident and fails to keep his supervisor notified monthly stating the probable date of his return

to work. In cases of pregnancy, the first such notification must be given no later than eight (8) weeks after termination of pregnancy.

D.    Is notified within a year from date of layoff for lack of work that he may return but fails to return or to give satisfactory explanation within two (2) weeks.

E.    Is absent from work without satisfactory explanation beyond the period of any leave of absence granted him by the Employer.

F.    Is absent from work for a continuous period of more than one (1) year for any reason other than a leave of absence granted in advance.

The service record of each employee laid off and re-employed after layoff for lack of work, will be reviewed by the Employer at the time of his re-employment in each case, such employee will be notified as to his service credits and continuity of service if any. If the Employer re-employs an employee who has lost service credits and continuity of service

because of layoff due to lack of work for more than one (1) year, such employee shall have such service credits and continuity of service automatically restored if such layoff did not exceed five (5) years and if his continuous service at the time of his layoff was greater than the total length of such layoff.

4.    Service Credits

Service Credits for each employee shall be granted for the periods during which the employee is actually at work for the Employer and for absences as follows;

A.    Employees without continuity of service who lose time due to a compensable accident will receive service credits for such lost time up to a maximum of three (3) months. For all other absences of two (2) weeks or less, such employees will receive service credits, but if absent more than two (2) weeks, no service credits will be allowed for any part of such absence.

B.    Employees with continuity of service, if absent on account of illness, accident

78                                                                                      79

or layoff, will recei.. service credits for any absence of six (6) months or less. Where any such absence exceeds six (6) months, no service credits will be allowed for the excess time. However, where the absence of such an employee is due to a compensable accident, and where the employee is re-employed without loss of continuity of service, service credits will be restored for the period of his absence in excess of six (6) months up to a maximum of six (6) additional months. For all other absences of two (2) weeks or less, such employees will receive service credits, but if the absence is longer than two (2) weeks no service credits will be allowed for any part of such absence.

If an employee who has lost prior service credits or continuity of service is re-employed, he shall be considered a new employee and will not receive service credits (unless all or part of prior credits are restored) for any time prior to the date of such re-employment.

C.    Notwithstanding the above provisions, a person who is returned to work directly

..om an absence of greater than one year that is classified by the State of Washington as a compensable disability absence, will have prior service credits, as well as service credits for the first twelve (12) months of absence, restored. Up to an additional twelve (12) months service credit may be granted upon approval of the President of the Employer or the designated representative.

## ARTICLE XIV
## GENERAL PROVISIONS

1.  This Agreement and Hanford Multi-Company Pension and Insurance Plans are in full settlement of all issues covered in the collective bargaining negotiations between the parties preceding the execution of this Agreement.

2.  This Agreement and Hanford Multi-Company Pension and Insurance Plans represent the complete understanding of the parties and any practice, term or condition not expressly contained herein need not be recognized.

## ARTICLE XV
## LEAVE OF ABSENCE AND MILITARY LEAVE

1. Employees with at least one (1) year of continuous service may be granted leave of absence, without pay, for compelling personal reasons except employment elsewhere, for a period of three (3) months or less, upon the approval of the Director, Industrial Relations, and provided that written notice is given at least thirty (30) days prior to the beginning of the leave of absence. Inability to give a thirty (30) day written notice will be given consideration on a case-by-case basis. In cases of emergency, employees with less than one (1) year of continuous service will be considered.

2. Requests for a longer period, up to one (1) year will receive consideration.

3. Further, upon request of the Council, an employee with at least one (1) year of continuous service will be granted leave of absence without pay, to act as a Council officer or as a business representative of any of the local unions composed at least in part of the employer's employees, and which are affiliates of the Hanford Atomic Metal Trades Council. Requests for extensions will be granted; however, the total absence will not exceed six (6) years.

4. Time out on account of leave of absence will be deducted in computing continuous service. It will not be deducted in computing seniority, as defined in Article XII.

5. Employees on approved leave of absence may retain their group insurance by paying premiums in accordance with the group plan. However, weekly sickness and accident insurance will be continued only for the period for which the premium has been paid in advance, with a maximum period of not more than thirty one (31) days.

**Military Service**

6. Both parties shall abide by and comply with all legal requirements applying to the re-employment of employees who enter the Armed Forces of the United States.

82

83

**Military Pay Differential**

7. It is the policy of the Employer to recognize employee obligations to perform temporary or short term military duty such as summer training for reservists. To the extent practicable and consistent with an orderly prosecution of the work, employees will be granted absences from work to fulfill such military obligations and will receive allowance as provided herein below.

8. Any employee with fifty-two (52) or more weeks of service credits, who is absent from work for temporary or short term military duty, shall be granted a military pay differential for up to thirteen (13) working days during which he is absent in a calendar year. There will be no deduction of service credits for these absences. Such military pay differential shall be the amount by which the employee's normal salary, calculated on the basis of work week up to a maximum of forty (40) hours, which the employee has lost by virtue of such absence, exceeds any pay received from the Federal or State Government. Such items as subsistence,

rental    travel allowance shall not be included in determining pay received from the Government.

9. Employees who have less than fifty-two (52) weeks of service credits may also be absent for the reason and time period set forth above without deduction of service credits for such absence but shall not be eligible for the military pay differential.

10. An employee may not receive a vacation pay allowance and a military pay differential for the same time period. An employee may, however, receive a military pay differential for the period, if any, by which the time spent in temporary or short term military duty does not coincide with such vacation, but not exceeding the maximum specified above.

11. Employees with fifty-two or more weeks of service credits who are members of the National Guard or Reserve components may be called out by the President or Governor(s) for emergency duty. A military pay differential shall be granted for up to five (5) working days per emergency situation to employees called out for such duty. There will be no deduction of service credits for

84

85

these absences. The milita., pay differential will be calculated as set forth in Section eight (8) of this Article.

## ARTICLE XVI
## WORK CONTRACTED OUTSIDE

1. The Employer intends to maintain a work force consistent with scheduled requirements, and under those conditions, to make every effort, consistent with the Project Hanford Management Contract, to provide regular employment for its bargaining unit employees before work is contracted outside. When services covered by HAMTC certifications are not to be performed by the Employer, or another HAMTC-represented Employer, the work must be processed through the turndown procedure identified in paragraph 2 below.

2. The Employer will notify the Council President in writing of any work to be contracted out, with the exception of work covered by the Davis-Bacon Act. Such discussions are to provide an opportunity to agree with the Employer's decision, or submit alternate methods to perform the work

86

utilizin_ .AMTC represented employees (reference Attachment H). Any proposed alternative methods are to be provided not later than the end of the second workday following the day the initial discussion was held. The final decision regarding work contracted out will remain with the Employer.

3. Both parties recognize that concerns over this general problem can best be avoided by periodic discussions which will provide the basis for the Employer and the HAMTC to work for innovative and appropriate ways to accomplish the Hanford cleanup.

## ARTICLE XVII
## GRIEVANCE PROCEDURE

1. The Employer shall recognize a Council Grievance Committee, not to exceed one for each affiliate unless changed by mutual agreement. The Council Grievance Committee will function at Step 2 of the grievance procedure.

2. The grievance procedure shall be used for the purpose of settling claims and disputes

87

on all matters subject to co. ....live bargaining between the parties during the term of this Agreement, whether or not such claims or disputes involve the interpretation or application of this Agreement. The grievant will not suffer loss of pay while processing a grievance through the following steps. Grievances shall be processed in the following manner:

### PRE-GRIEVANCE ORAL DISCUSSION

Any employee or group of employees having a grievance shall take the matter up with the appropriate Steward who shall attempt to adjust the matter consistent with the terms of this Agreement with the aggrieved employee's immediate manager.

If the Council wishes to grieve the actions of another facility/company and there are no stewards in that location, a steward will present the grievance to his immediate manager. Industrial Relations personnel will facilitate with the grievant's immediate manager, the appropriate steward and the manager involved in the alleged violation.

### STEP 1

If not settled satisfactorily in the Pre-Grievance Oral Discussion, the grievance will be reduced to writing and shall be given to the appropriate Union Steward of the craft involved, who shall file it with the Employer, who shall supply the Council with a copy. Within ten (10) days a meeting shall occur with the aggrieved employees immediate manager, and an Industrial Relations Representative to address the matter.

However, in the event the grievance deals with action in another facility/company, Industrial Relations personnel will facilitate a meeting with the grievant, the grievant's immediate manager, appropriate steward and the manager involved in the alleged violation.

The manager will give a reply in writing within three (3) working days after such meeting. Copies of grievance answers at Step 1 will be provided to the Council in a timely manner by Industrial Relations.

## STEP 2

If not satisfactorily settled at Step 1, the written grievance shall be referred to the Council Grievance Committee which will schedule a meeting on a monthly basis for discussion of unresolved grievances with Employer representatives. The Council shall advise the Employer regarding the grievance to be presented at least five (5) days before the meeting. The Employer shall give its answer to the Council within ten (10) days after completion of discussions of any grievance.

A portion of time during Step 2 grievance meetings may be utilized for discussion of outstanding problems related to work assignments.

3. If no agreement is reached, the dispute may be referred to arbitration in accordance with Article XVIII. If arbitrability of the dispute is in question, the Arbitrator shall first decide this issue by bench decision before hearing the rest of the dispute.

4. A grievance of a general nature may be presented as a General Grievance at Step 2 by either the Council or Employer representatives. In either case, five (5) days notice will be given except in cases of emergency.

5. Any grievance not taken up within ten (10) days after the occurrence of the grievance cannot be processed through the grievance procedure. A grievance that has been processed at Step 1 shall be considered settled without prejudice if the grievance is not scheduled at Step 2 in the above procedure within ten (10) days after the Step 1 answer was given.

6. All time limits noted in this Article are exclusive of Saturdays, Sundays, and facility closure days and can be extended by mutual agreement of the parties.

7. The parties understand that the grievance procedure with all requirements and limitations is equally available to both parties, labor and management.

# ARTICLE XVIII
## ARBITRATION

1. Any grievance which remains unsettled after having been fully processed pursuant to the Grievance Procedure, may be taken to arbitration, by request of either party, within sixty (60) days after the Step 2 answer has been rendered.

2. The Arbitrator shall not have the authority to add to, disregard, or to modify any of the terms of this Agreement, including; salary rates, benefit plans or job classifications.

   Additionally, the Arbitrator shall not have the authority to review, revoke, modify or enter any award with respect to:

   A. The discharge of any employee having less than ninety (90) working days of seniority credit in the bargaining unit.

   B. Discharge removals made at the direction of the Department of Energy under the terms of the Prime Contract with DOE.

3. Within (10) days after either party notifies the other of its desire for arbitration, as provided herein, either party may request the Federal Mediation and Conciliation Service, or its successor, in writing, to submit a list of not less than five (5) arbitrators from which the Council and the Employer shall strike off the names on the list who are not acceptable and shall indicate the order of preference of those remaining. In the event all names are stricken from the list the Council and the Employer shall, within ten (10) days of such action, request the Federal Mediation and Conciliation Service, or its successor, to submit a second list of not less than five (5) arbitrators and the above procedure shall be followed.

4. All time limits noted in this article are exclusive of Saturdays, Sundays and facility closure days. They can be extended by mutual agreement of the parties.

5. Each party shall bear its respective expenses and the expenses and fee of the arbitrator shall be shared equally by the Council and the Employer.

6. In the event a dispute shu     arise involving any classified information, the arbitrators must have a security clearance as required by the Department of Energy.

7. It is understood that no information that is proprietary or business sensitive to the Employer or to a sponsor of work at the Hanford Plant will be utilized or disclosed in the arbitration process unless all persons including arbitrators, involved in the arbitration process who are not employees of the Employer have first executed an agreement in the form attached hereto as Appendix "A", and entitled "Agreement of Non-Disclosure of Proprietary Information," which by this reference is made a part of this Agreement as though fully set forth in the body of the Agreement.

8. Cost of official transcripts of arbitration proceedings shall be at the expense of the requesting party which shall include a copy furnished to the other party and the Arbitrator.

## ARTICLE XIX
## WAGE AND SHIFT PREMIUM

1. Appendix A, attached hereto, contains wage scales, seniority groups, job classifications in the various seniority groups and lines of progression for each classification group as mutually agreed upon by the Employer and the Council, which by this reference is made a part of this Agreement as though fully set forth in the body of the Agreement.

2. Employees will be placed on the progression scales at the appropriate rate of pay for their assigned classification and their rates will increase with the progression scale for their classification as set forth in, and in accordance with the provisions of Appendix A, effective as of the date of this agreement.

3. The pay period for HAMTC represented employees shall be on a weekly basis. The Employer will endeavor to pay all wages earned during a pay period on the Friday immediately following the weekly pay period.

4. An employee may be "detailed" to a higher rated job classification and a higher rate for

a period of one (1) day, o    e basis of the rules of transfer, if fully qualified, and assigned to and given the full responsibility of the higher rated job for the full day.

5. Only employees qualified to perform the higher rated job and who, in most cases, are on top of the progression schedule in their present classification will be given the full responsibility of temporary assignment to a higher rated job. All other factors being equal, detailing will be assigned according to seniority. Detailing will be divided as equally as practicable among employees having the same seniority date.

6. General Wage Increase

A. Effective April 7, 1997, Fluor Daniel Hanford, Inc. Appendix A Wage Scale will be amended to reflect a general wage increase of 3.5 percent to each employee's paid wage rate and new progression schedules, job classifications and wage scales, excluding shift differential or overtime premiums.*

*Not included in this booklet.

96

B. Eff    ve April 6, 1998, a general wage increase of 3.5 percent will be added to each employee's paid wage rate in effect on April 5, 1998.

1. In addition to the general wage increase resulting from (A.1) above, a cost-of-living adjustment will be made. The amount of the cost-of-living adjustment, if any, shall be determined based on the increase in the Bureau of Labor Statistics Consumer Price Index Urban Wage Earners and Clerical Workers - U. S. City Average All Items (1982-1984 = 100), hereafter referred to as the "Index" from February, 1997 to February, 1998 in accordance with the following formula.

After an increase in the Index of four (4%) percent during the measurement period, seventy-five (75%) percent of the percent rise in the Index thereafter, up to but not exceeding ten (10%) percent rise in the Index will be applied to the wage rate as indicated above.

The maximum cost-of-living adjustment increase that could be generated from

97

this formula is fou.  .int five (4.5%) percent [seventy-five (75%) percent of six (6%) percent].

2. The cost-of-living adjustment specified above shall be applied to the job rate of the applicable classification and the percentage relationship between the various progression step rates and the job rate will be maintained after the cost-of-living adjustment, if any, has been applied to the job rate.

C. The parties agree that beginning March 1, 1999, and for a period of thirty (30) days thereafter, this contract will be reopened for the limited purposes of negotiating wage rates, and other mutually agreed upon items, to be effective in 1999 and/or 2000 and 2001, if either party so notifies the other in writing of its desire to enter into such limited negotiations no later than thirty (30) days prior to March 1, 1999.

If at the end of the thirty (30) day period which expires March 30, 1999, the parties have failed to agree upon new terms and conditions for wage rates, or

ot  mutually agreed upon reopened items, then effective April 5, 1999, a general wage increase of two (2%) percent will be added to each employee's paid wage rate in effect on April 4, 1999, and the termination of modification of this contract shall be as provided in Article XXVIII hereof. Should the parties reach a new agreement in 1999, the terms of that agreement will govern the further application of this contract.

1. Unless otherwise agreed upon during the 1999 reopener negotiations, in addition to the general wage increase made above, a cost-of-living adjustment, will be made. The amount of the cost-of-living adjustment, if any, shall be determined based on the increase in the Bureau of Labor Statistics Consumer Price Index Urban Wage Earners and clerical Workers - U. S. City Average all items (1982-1984 = 100), hereafter referred to as the index, from February, 1998 to February, 1999 in accordance with the following formula.

After an increase ...he index of four (4%) percent during the measurement period, seventy-five (75%) percent of the percent rise in the index thereafter, up to but not exceeding ten (10%) percent rise in the index, will be applied to the wage rate as indicated above.

The maximum cost-of-living adjustment increase that could be generated from this formula is four point five (4.5%) percent (seventy-five (75%) percent of six (6%) percent].

2. The cost-of-living adjustment specified above shall be applied to the job rate of the applicable classification and the percentage relationship between the various progression step rates and the job rate will be maintained after the cost-of-living adjustment, if any, has been applied to the job rate.

D. Should the index in its present form and calculated on the same basis as the last index published prior to the effective date of this contract, become unavailable and if the Bureau of Labor Statistics issues a c...ersion table by which changes in the present index can still be determined, the parties agree to accept such conversion table. If no such table is issued, the parties will promptly undertake negotiations solely with respect to agreeing upon a substitute formula for determining a comparable cost-of-living adjustment. The purpose of a new index or conversion formula shall be to produce as nearly as possible the same result as would have been achieved using the index in its present form. Any such conversion table or substitute formula will retain the same maximum amount limitations set forth above in this article. If after such negotiations the parties fail to reach agreement, the matter shall be submitted to final and binding arbitration as provided for in Article XVIII of this contract.

7. **Shift Premium**

Employees who are assigned to and work on any day on a recognized shift which is scheduled to start before 6:00 a.m. or end

after 6:00 p.m. will recei   . shift differential of fifty (50) cents per hour while working such shifts.

Employees who start work prior to the start of the shift to which they are assigned and continue to work into the assigned shift will be paid shift differential, if applicable to the assigned shift, computed at the applicable rate for all hours worked.

Employees who are held over from the shift to which they are assigned will be paid shift differential, if applicable to the assigned shift, computed at the applicable overtime rate for all hours worked.

## ARTICLE XX
## BENEFITS

1. The following benefit plans and their general administrative rules are listed in an Insurance, Pension and Savings Agreement that has been agreed to by the Parties and is included in this Agreement (Attachment C).

A.   rance Plan (Includes Medical, Life, Accidental Death and Short-term Disability)
B.   Pension
C.   Savings
D.   Personal Accident
E.   Long Term Disability
F.   Dependent Life Insurance
G.   Dental Assistance
H.   Dental Plus
I.   Vision Care
J.   Travel Accident

## ARTICLE XXI
## APPRENTICES

1. The Apprenticeship Program jointly administered by the Employer and the Council in accordance with the Standards of Apprenticeship, as approved by the Washington State Apprenticeship Council, shall be continued during the term of this Agreement. By mutual agreement, the parties will determine the staffing needs of the Program.

2. It is understood by the parties that there is no requirement that the Employer hire any

person or transfer any [em]ployee solely to participate in the Program. It is further understood that this entire Apprenticeship Program and all collateral agreements will expire on the termination of this Contract, unless the Employer and the Council mutually agree to an extension of the Program.

3. An apprentice enrolled in the FDH-JATC Apprenticeship Program cannot be displaced by a Journeyman unless so stipulated within the Standards of Apprenticeship.

4. The parties have agreed that there will be no more than approximately* one (1) apprentice for five (5) journeymen in any craft-type seniority group. It is understood that the ratio may not be maintained during a period of staffing a new facility.

5. Employees in the FDH-JATC Apprenticeship Program may be displaced at the time they complete their apprenticeship program provided the displacing employee was in the same classification as the Apprentice and the displacing employee had greater seniority than the Apprentice when the reduction of force actually occurred.

104

*The term "approximately" recognizes the day-to-day variations in these ratios which may occur.

## ARTICLE XXII
## SEPARATION PAY ALLOWANCE

1. The intent of this Article is not to reduce any previously accrued separation pay benefits at the time of the transfer to the Employer.

2. General

   An employee of the Employer with one (1) or more years of continuous service will, in accordance with the provisions hereinafter set forth, have available a separation pay allowance for use in event of layoff for lack of work from the Hanford Plant.

3. Computation of Separation Pay Allowance

   The allowance shall be computed on the basis of one (1) week's pay for each of the employee's full years of continuous service as defined in Article XIII plus one-quarter (1/4) of a week's pay for each additional three (3) months of continuous service at

105

the time of layoff. A "wee.. pay" shall be the employee's normal straight time salary (excluding shift differential and overtime) in effect at the time of layoff.

4. An eligible employee laid off for lack of work by the Employer will be paid the separation pay allowance for which he is eligible subject to the following conditions:

A. The Employer will determine at the time of layoff if the separation is expected to exceed six (6) months, hereinafter referred to as "permanent layoff."

B. At the time of permanent layoff, an employee will be given the option of:

(1) Receiving his separation pay allowance in a lump sum at the time of layoff, or

(2) Not receiving the separation pay allowance until six (6) months have elapsed, at which time the allowance will be paid in a lump sum.

In the event an employee elects option (1) above, he will agree at the time of layoff that if he is offered reemployment in his former

106

job cla.. .lication within six (6) months after layoff, he will repay to the Employer within one (1) year from the date of the offer, or the date of re-employment, the total amount of the allowance paid him under this option (B)(1). If the employee fails to repay the total allowance during the specified time period, and notwithstanding any other provision of this Agreement, all service and seniority credits previously accumulated and continuity of service will be extinguished, and the employee will not be eligible to accrue new separation pay credits until he shall have worked for the Employer from the date of his re-employment for a period of time equal to the period he had previously worked to accumulate the separation pay credits for which he was eligible at the time of his layoff.

C. An employee will not be regarded as having been given a permanent layoff if the Employer determines at the time of separation that the layoff is not expected to exceed six (6) months. Under this condition, the employee will be given the option of:

107

(1) Receiving after one ⌐nth in layoff status one-sixth (1/6) of the separation pay allowance for which he is eligible, and one-sixth (1/6) each month thereafter until he has been offered re-employment in his former job classification, or until the full allowance has been paid: or

(2) Not receiving any separation pay allowance until six (6) months have elapsed, at which time the allowance will be paid him in a lump sum.

In the event an employee elects option (C) (1) above, he will agree at the time of layoff that if he is offered re-employment in his former job classification within six (6) months after layoff, he will repay to the Employer within one (1) year from the date of the offer, or the date of re-employment, the total amount of the allowance paid him under this option (C) (1). If the employee fails to repay the total allowance during the specified time period, and notwithstanding any other provisions of this Agreement, all service and seniority credits previously accumulated and continuity of service will be extinguished, and the employee will not be elig̣  ̣ to accrue new separation pay credits until he shall have worked for the Employer from the date of his re-employment for a period equal to the period he had previously worked to accumulate the separation pay credits for which he was eligible at the time of his layoff.

D.   An employee who has received the total separation pay allowance for which he was eligible in accordance with (B) or (C) above, and who is re-employed in his former job classification after having been in layoff status in excess of six (6) months will be afforded seniority and service credits as provided in Articles XII and XIII of this Agreement. Such an employee will not be expected to repay the separation pay allowance, and he will be eligible to accrue new separation pay credits upon completion of one (1) year of continuous service from the day of his re-employment. Upon completion of this minimum service period, new separation pay credits will accrue on the same basis as set forth in (3) above up to a maximum of twenty (20) weeks total separation pay credits which includes credit for

the one (1) year mini    n service period.

**E.** Eligibility for separation pay allowance will automatically expire for employees who leave the employment of the Employer at the Hanford Plant.

**F.** In the event that responsibility for operation of part or all of the Hanford Plant is assumed by another contractor or Government agency, employees who are transferred to the employment of, or who are offered employment at positions of comparable responsibility by such contractor or Government agency, which employment will commence within thirty (30) days after the employee is terminated or laid off by the Hanford Plant, shall not be considered as laid off or terminated for the purposes of this Article.

**5. Other**

**A.** The provisions of this Article shall not be applicable where the Employer decides to close a Hanford Plant or an operation or layoff an employee

bec   e of the Employer's inability to carry on its operations, as a consequence of a strike, slowdown or other interference with or interruption with work participated in by employees. However, the operation of this Section shall not affect the rights or benefits already provided hereunder to an employee laid off for lack of work prior to the commencement of any such strike, interference or interruption.

**B.** A grievance arising under this Article may be processed in accordance with the grievance procedures set forth in Article XVII. However, no matter of controversy concerning the provisions of this Article, the interpretation or application thereof shall be subject to arbitration under the provisions of Article XVIII hereof, except by mutual agreement.

## ARTICLE XXIII
## NO STRIKE CLAUSE

**1.** There shall be no slowdowns, work stoppages, strikes, sympathy strikes, or

picketing of any kind of the employer on or near the site of, or related to work covered by this Agreement. The Council will make every good faith effort to avert or end any actual or threatened strike in violation of this Article.

2. The Employer agrees not to lock out employees represented by the Council on work covered by this Agreement. The term lockout does not include discharge for cause or layoff.

3. FDH and its subcontractors will not cause bargaining unit employees to be assigned to any other contractor at the Hanford Site to replace the employees of such other contractor while that contractor is being subjected to strike action by a bonafide labor organization.

## *ARTICLE XXIV*
## LABOR ASSETS MANAGEMENT PROGRAM (LAMP)

1. All active HAMTC represented employees shall be assigned to perform work in their regular job classification with one of the sub-contractors of Fluor Daniel or its enterprise companies. Employees are subject to work assignments as necessary to meet the needs of the business, however, insofar as practical the Employer will be responsive to future work assignment preferences of the employees. For purposes of this Article, a `Company' refers to a PHMC sub-contractor and/or an enterprise company. Duration of, or changes in work assignments shall be administered pursuant to the Labor Assets Management Program (LAMP).

2. Employees may be reassigned from one supervisory work group to another within a company to most effectively accomplish work needs. Barring special circumstances, volunteers from the affected supervisory work group that the reassignment will initiate from will be solicited and the senior employee will be selected. If no volunteers exist, the junior employee in the affected work group will be assigned.

112

113

# FILLING ASSIGNMENT VACAN~    AND JOB OPENINGS

1. Vacancies are filled under the following conditions:

   A.  Must have been on his present assignment for at least one year after being fully trained and qualified.

   B.  Must have submitted a Reassignment Request Form (RRF) to the Labor Assets Manager (LAM). The request will be valid for six (6) months, but may be renewed thereafter. Only two active RRFs can be on file with the LAM. The RRF will specify the desired work location. If the employee declines the work assignment, the employee's RRF will be canceled.

2. If there is a Declaration of Excess:

   A.  The most senior of the appropriate employee's RRFs and/or excess employees across the PHMC, BHI and THI will bump the most junior employee in the classification. The excess employee is identified by asking for

volunteers and, lacking volunteers, the most junior employee in the affected work group. If an excess employee is placed, the process is ended. If an employee who has filed a RRF is placed, the identified excess employee goes to the backfill and the process is ended.

   B.  A copy of the Declaration of Excess will be provided to the Council President.

3. If an opening develops and there are no employees who have been declared excess:

   A.  Honor the most senior employee's RRF within the PHMC, BHI and THI.

   B.  Staff the backfill (one only) with the most senior employee's RRF within the PHMC, BHI and THI.

   C.  Employees will be selected according to the rules of seniority. Exceptions may occur for reasons such as health and safety of the employees, the progress of the work, certification, security clearances, work restrictions, radiation exposure, training and qualification,

114

115

and circumstances  individual hardship to the employee.

D. An individual who is selected for the open position will be moved to the new work location within thirty (30) calendar days. Exceptions must be approved by the Director of Industrial Relations, FDH.

4. If the opening has not been filled by an employee's RRF or excess employee, the most senior qualified employee on the recall list will fill the position.

5. Persons in layoff status, if qualified, will be the first recruitment source for job openings, including entry level, that might develop.

6. Candidates as referenced in Article XXV, Miscellaneous Conditions, Section 9, Recruitment Sources will be considered.

7. Consideration will be given to employees who have requested a reassignment from their current seniority group to another classification in a different seniority group, as described in Article XII, Seniority, Section 7.

116

8. After the above provisions have been exhausted, the Company may hire from the outside.

PROBATIONARY EMPLOYEES

1. Employees who are in the probationary period are not eligible for voluntary reassignment.

TEMPORARY REASSIGNMENT

1. The needs of the PHMC may warrant that a certain work scope is of a nature that requires the expeditious mobilization of crafts to temporarily support or supplement the existing workforce of a company. When rush needs are identified, the Labor Assets Manager will determine, with the company management, the availability of crafts for temporary reassignment to perform the work.

2. If it is determined that a pre-selected supplementary work force is desired to respond to rush needs, discussions will be held with the Council before such crew is established.

117

3. Assignment of an emplo___ from one company to another for a period of sixty (60) working days or less is considered a "temporary reassignment." As a general guideline, management will assign employees for such assignment based on the following:

   A. Volunteers.

   B. Lacking volunteers, the least senior employee within the supervisory work group.

4. Health and safety of the employees, the progress of the work, certification, security clearances, work restrictions, radiation exposure, training and qualification, circumstances of individual hardship to the employee, and other factors may preclude rigid adherence to the least senior employee being assigned.

## ARTICLE XXV
## MISCELLANEOUS CONDITIONS

1. The Employer reserves the right to establish and modify jobsite work rules. The parties hereto agree to comply with all security requirements and site access rules established by DOE. All jobsite work rules shall be posted in appropriate locations.

2. The working leader classification may be established for each seniority group. A working leader is responsible for taking the lead and providing direction to other workers in the group while performing the same duties as performed by the work group. Duties to include instructing members of the group as well as doing specific assigned duties such as keeping records, controlling processes or projects in a manner outlined by management. The need for a working leader and the duration in which the employee is classified as a working leader will be dependent upon the work to be performed. Management will have the sole responsibility to determine if the work to be performed requires a working leader and the number of working leaders. Job functions include utilizing appropriate safety precautions at all times including good housekeeping, and is responsible for functionally directing the work group. The employee(s) to be selected and to be retained in this job classification must demonstrate overall job and plant knowledge and have the

118

119

added ability to lead and ____ect other employees. All requirements being equal, seniority will be a factor used to determine the selection.

Working Leaders will be paid five percent (5%) above the employee's current rate of pay unless otherwise noted in Appendix A. The Working Leader classification is not treated as a higher classification for purposes of seniority.

3. Employees will be at the place of work designated by the Employer at the starting time and shall remain at their place of work until quitting time.

4. Adequate facilities will be provided for employees in which to dry their clothes and eat their lunches. Lockers and showers will be provided for as required. These facilities shall be adequately heated and cooled, and shall not be used for storing supplies, tools, or equipment.

5. Trading Days of Rest in Order to Connect such Days With Vacation

It is rec____ized that employees working the day shift have been allowed to "trade" days off with an employee of the same classification and on the same shift in order to (a) extend their vacation by one (1) day, or (b) allow for flexibility in determining their first scheduled day of rest during that week, for their personal convenience.

It is not the desire of the Employer to disturb this arrangement, with respect to its employees represented by the Council, subject to the following conditions:

A. A "trade" of scheduled days off will automatically revise the days-off schedule for the individuals involved and the revised schedule will be utilized in computing overtime or premium pay for the week in question.

B. Any trade of Days of Rest will not create additional overtime costs to the Employer.

C. The determination with regard to the continuation of such "trades" will continue to be at the discretion of the supervisor.

6. **Hold Over Transportation**

Employees may be held over due to the need for particular skills, or to insure job continuity or for equally good reasons. On such occasions, where the employee held over requires special transportation at the conclusion of the hold-over assignment, it will be arranged by management.

Employees who would require special transportation normally will not be held over if the sole reason for holding over the employee is to equalize the distribution of overtime. However, if an employee is held over for this reason and special transportation is required, it will be arranged by the manager or supervisor involved.

7. **Attendance of Stewards at Disciplinary Meetings**

When an employee is to be contacted by supervision in regard to a disciplinary matter, the Employer recognizes the right of an employee to have his Steward present during the discussions with supervision.

122

8. **Continued Wearing of Face Masks**

The Employer will not require an employee to continuously wear a full-face fresh-air or exhaust-type face mask for more than two (2) hours without there being a fifteen (15) minute period during which that employee would not be required to wear the mask.

9. **Recruitment Sources**

In Attempting to fill job openings with outside hires, the Employer will regard employees who have been permanently (expected to last six (6) or more months) and involuntarily laid off for lack of work from Battelle Northwest as the first source of recruitment before utilizing outside sources if such laid off employees have made application for employment with the Employer. Consideration for employment selection will be given to such employees in terms of their qualifications (the employee must be qualified in the judgement of the Employer to perform the available work), past performance, physical requirements of the job, and their relative continuity of service. Individuals employed under this provision will have new hire status. No

123

individual has an automa   right to an opening. This provision is not intended to diminish the current rules of seniority or jurisdiction.

An employee who has accrued less than twenty (20) weeks separation pay credits and whose separation pay credits have been transferred from WHC/BCSR/ICF-Kaiser to the Employer shall continue to accrue additional separations pay credits up to the same maximum twenty (20) weeks total separation pay credits.

10. Temporary Employees

Temporary employees may be hired for periods not to exceed ninety (90) working days. Workings days shall mean any day on which an employee actually performs work for six (6) or more hours, regardless of whether that work occurs on a regularly scheduled work day, but no credit shall be given for any day on which an employee has not actually performed work for six (6) or more hours. Such employees will be hired for short term needs that cannot be appropriately satisfied by the employment of regular full time employees. No layoff of

regular    time employees will occur as a result of the utilization of temporary employees in the same classification. Every reasonable effort will be made to accurately forecast requirements for temporary employees and a need assessment will be discussed with the appropriate HAMTC representative (normally the Project Chief Steward of the affected seniority group in the area where the work in question will take place), prior to the issuance of requisitions for temporary employees.

The Employer may utilize candidates who are referred by HAMTC and make application for employment.

If a laid off employee is re-engaged as a Temporary to work in his former classification, he will be placed on the wage progression scale at his previous level.

Temporary employees will not be placed on 10 or 12 hour shifts without mutual agreement of both parties.

The Employer will supply HAMTC on a timely basis with the names of temporary employees who are hired or who are

scheduled for release fro... employment.

Temporary employees will be eligible for facility closure day pay if employed at the time of the facility closure day and if they meet other facility closure day pay requirements.  Other than facility closure days, temporary employees are not eligible to participate in employee benefit and TOWP plans.  If a temporary employee works on a facility closure day, the day would count against the ninety (90) day limit; if the employee does not work on the facility closure day, they will be paid for the facility closure day but the day will not count against the ninety (90) day limit.

Temporary employees will not earn seniority, however, if a temporary employee is changed to regular full time, the seniority date will become the date of his most recent hire or the date of his entry into his seniority group, whichever is the most recent.

Each employee new to the bargaining unit will have only one probationary period of ninety (90) working days, exclusive of time they are off the active payroll.  The probationary period will extend for the full

ninety (  ) working days regardless of whether or not the employee's status is temporary or regular full-time.

Temporary employees will not earn service credits, however, if a temporary employee is made regular full time, service credits will be granted from the date of the most recent hire.

Temporary employees will not be asked to work overtime unless the overtime work has been turned down by the regular full-time employees in the overtime area.  The Employer is willing to discuss issues of overtime for temporary employees upon request of the Council.

If qualified to do the work, employees in layoff status from the Employer will be given first consideration for temporary positions.

Temporary employment with the Employer will not affect the status of a laid off employee, i.e., benefits, seniority accumulation, recall rights, separation pay, etc.

126

127

No additional days are co. ad against the ninety (90) days for work performed in excess of eight (8) hours in a workday. Temporary employees are to be utilized for overtime work as a last resort.

Any request for a "roll-over" of a temporary employee will be reviewed against the availability of other qualified applicants, skills required and projected completion of the second assignment. Each request must be mutually agreed to by the Employer and the President of HAMTC.

The parties recognize that concerns may occasionally arise regarding the use of temporary employees. In that event, either party may request a meeting, which will convene at a mutually agreeable time, to discuss and attempt to resolve the issues.

Six (6) months and twelve (12) months after the date of ratification, and at other mutually agreeable times, the parties will meet to review the history of the employment of temporaries. If the use of temporaries is unsatisfactory to HAMTC after twelve (12) months from the date of ratification of this Agreement, the use of temporaries will be

modified provide that laid off regular full-time employees be recalled in their specific job classification as regular full-time employees prior to hiring temporary employees. The employee may decline a recall to work for a temporary period of time without forfeiting his recall rights. If the use of temporaries has been unsatisfactory to HAMTC, it will be discussed in the 1999 Reopener.

11. Craft Alignment Program

Safety is foremost in the performance of all work. All employees are encouraged to think, act and perform their assigned tasks giving the highest priority to safety.

The Craft Alignment Program (CAP) is intended to allow greater flexibility and therefore more effective and efficient use of the workforce. Bargaining unit employees will be assigned to augment the work effort and assist the classification which performs the main work effort, consistent with the provisions of the collective bargaining agreement.

128

129

In making these assignments, the following parameters will be followed:

A.    Safety is foremost in the performance of the work.

B.    Assignments will be completed using mutual assistance in the performance of work with another classification where the employee has the qualifications and can perform the work safely.

C.    Job classifications, seniority and seniority rules will be unchanged.

D.    There will be no formal cross-training program into other classifications; however, incidental on-the-job training and mutual sharing of knowledge and skills, in order to accomplish the work in a more efficient and cost effective manner, will be expected.

E.    There will be no change in layoff procedure. If layoffs occur, they will be made within each classification on the basis of seniority and the ability to do the work within a classification.

Consistent with past and present philosophy of the Employer, increases or decreases in employment levels will be determined by the work-place needs for the classification involved.

F.    Employees will not be laid off as a result of implementation of this program.

G.    The employee will be paid the wage of his classification regardless of the type of work he might be performing. This is not intended to diminish the provision for "detailing" as provided in Article XIX Wage Rates, Section 4 of this Contract.

H.    After the CAP has been put into effect, disputes resulting from this arrangement will first be addressed by an ad hoc committee consisting of, but not necessarily limited to the Chief Stewards of the affected affiliates and management representative(s). Such meetings shall not be regularly scheduled but will be convened upon the request of either party. Disputes not resolved through this committee

130

131

may then be grieved per the grievance procedure contained within Article XVII - Grievance Procedure. All time limits imposed by Article XVII - Grievance Procedure will commence after being addressed by the committee.

I.  The Craft Alignment Program will continue in full force and effect from this date, and henceforth on an annual basis from year-to-year without requiring an annual review process. However, either of the parties may request in writing, that a formal review of the program be conducted during August of any given year. If during this review process, either party cancels the program, the negotiated Wage Progression Schedule will be amended to reflect a 2% decrease to each employee's paid wage rate. Details of the program cancellation and wage rate decrease to be mutually agreed to by the parties.

12. There shall be no restrictions on work methods, techniques, production or equipment. It is the intent of the parties to perform work covered by this Agreement in the most efficient and cost effective manner possible, provided that those efficiencies are not in violation of any terms of this Agreement.

13. Employer Provided Information

A.  The Employer will furnish the Council with seniority lists of employees in the bargaining unit. Revised seniority lists will be furnished at three (3) month intervals.

B.  The Employer will give the Council President the names of employees to be laid off for lack of work prior to the time the employees are given written notification. The Council President will also be given the names of any employees who are discharged. In case of intent to discharge a Steward, the Employer shall notify the Council President immediately.

C.  The Employer will, twice each month, furnish the Council with the names, addresses (if the addresses are

available), and job classification of newly hired or re-hired employees who are covered by this Agreement.

D. The Employer shall furnish to each employee covered by the Agreement, a copy of said Agreement, and further, shall furnish a copy to each employee hired in the bargaining unit.

E. The Employer will furnish bulletin boards for use of the Council for posting Council announcements. Data, notices, or bulletins which the Council desires to have posted will be routed by the Council through Employer Industrial Relations for approval, which will not be unreasonably withheld.

F. Employees will be shown, and upon request will be provided with a copy of any records which are to be filed in the employee's personnel folder which involve ratings, warning notices, or other records concerning work performance.

The employee will be asked to sign such records indicating that the matter has been

134

brought to his attention, but with the understanding that such signature in no way implies that he necessarily agrees with the contents of such record. When such records are permanently removed from an employee's personnel folder, they will be returned to the employee's immediate supervisor, who will in turn give them to the employee. Upon request, an employee will be provided with a copy of the initial report of his industrial injury.

14. Political Action Contribution

Upon written request of a member of the Hanford Atomic Metal Trades Council on a form acceptable to the Employer and subject to revocation by the employee at any time, the Employer agrees to deduct from earned wages of the employee, contributions to the Affiliate Union's political action committee in a specified amount per month on the condition that such payroll deduction is in compliance with all applicable provisions of law, and that funds derived from such payroll deductions are disbursed from a separate segregated fund account of the identified Union, which is registered with the Federal Election Commission. The Hanford Atomic

135

Metal Trades Council agrees that it will defend, indemnify and save the Employer harmless against any and all claims made upon or suits instituted against the Employer arising out of or resulting from the application of the provisions of this Section.

15.    **Commercial Drivers License (CDL)**

The Employer agrees to reimburse all fees associated with obtaining a CDL for employees who are currently covered by requirements, including CDL renewal costs.

Employees will be allowed on-the-job study time, however job assignments and performance of the work take precedence over study.

Employees must meet all job requirements to transfer to posted openings. Employees who are selected for positions requiring a CDL, and who do not possess a CDL will normally be given thirty (30) calendar days to obtain a license prior to transferring to the open position. Additional compensation will not be given to employees upon obtaining a CDL.

16. **Voluntary Reduction of Force**

In the event that employees on the Hanford Plant are offered a voluntary reduction of force (VROF) the Employer will seriously consider extending the VROF to bargaining unit employees as has been our practice.

17. **Welding Pool**

Welders who, due to physical limitations, are no longer able to meet certification requirements will be allowed to bump into a seniority group represented by the local union that they are currently affiliated with. Each affiliate union shall determine the seniority placement of the employees bumping into their group, provided any such seniority would entitle them to jobs in agreed upon classifications under the following terms and conditions: the failure to maintain certification requirements due to physical limitations must be verifiable by HEHF and such physical limitations must not affect the employee's ability to perform the work of the appropriate craft; additionally, the employee must have five (5) or more years of accumulated seniority; and finally,

the employee must be qualified to perform the work.

## *ARTICLE XXVI*
## AUTHORITY

1. The Council is represented in its dealings with the Employer by the General Counsel or the President, Hanford Atomic Metal Trades Council, subject to the Bylaws of that organization, and the Employer is represented by the President, Director of Industrial Relations, Manager Administrative Services & Oversight, Chief Labor Counsel, or such representative as the President of Fluor Daniel Hanford, Inc. shall specifically designate in writing. It is understood and agreed that the incumbents of the aforesaid positions have authority on behalf of the Council and the Employer respectively to modify this Agreement, and to enter into arrangements to carry out and effectuate this Agreement, and otherwise to bargain collectively and that no agreements, arrangements, or understandings shall be binding upon the parties hereto unless executed in writing by such authorized

representative of the Council and the Employer.

## *ARTICLE XXVII*
## SAVINGS CLAUSE

1. If any provision of this Agreement is found to be invalid by proper authority, such findings will not serve to invalidate the remainder of this Agreement. This Agreement is subject to all applicable Federal and State laws and any rules and regulations issued pursuant thereto.

## *ARTICLE XXVIII*
## DURATION

1. This Agreement shall become effective this seventh day of August 1997 and shall continue in full force and effect through the 31st day of March, 2000 or the 31st day of March, 2002. This Agreement will continue year-to-year thereafter unless notice is given in writing by the Employer or the Council not more than ninety (90) days or not less than sixty (60) days prior to March 31, 2000 or

March 31, 2002 of its desire to modify, amend or terminate this Agreement.

2. Notwithstanding the above, this Agreement shall be terminable by the Employer prior to the expiration dates specified therein in the event that the Employer shall cease operations at the Hanford Plant of the Department of Energy under Prime Contract DE-AC06-96RL-13200, as amended between the Employer and the Department of Energy. Such termination shall be effective immediately upon the giving of written notice thereof to the Council.

# ARTICLE XXIX
## INTELLECTUAL PROPERTY AGREEMENT

1. Attachment I, attached hereto, which by this reference is made a part of this Agreement as though fully set forth in the body of the Agreement, will be executed by each employee as a condition of employment with the Hanford Plant.

140

# SIGNATURE PAGE

IN WITNESS WHEREOF, the parties hereto have caused their names to be subscribed to this Agreement by their duly authorized officers and representatives this seventh day of August, 1997, at Richland, Washington.

For The Employer           For The Council

Fluor Daniel Hanford,      HAMTC
Inc.

s/ J. H. Hanna            s/ Gary L. Muth
Director of Industrial     President
Relations


s/ Ben. D. Corder
Manager,
Administrative
Services & Oversight

141

## *ATTACHMENT A*
## OVERTIME PROCEDURE

### 1. PURPOSE

A. The Employer shall determine the need for overtime and retain the exclusive right to assign employees to work overtime in accordance with the overtime procedure.

B. To establish the basic principles for effecting an equitable distribution of overtime for the applicable crafts employed by the Employer consistent with the terms of this Agreement. Overtime groups are established separately for some crafts as listed in their Appendix A's.

### 2. METHOD OF DISTRIBUTION

A. Employees will normally be assigned overtime work on the basis of accumulated hours within their specific overtime group (Reference Section 12). Those with the least accumulated hours will normally be assigned first and so on down the list in the order of increasing accumulated hours.

B. It is recognized that the health and safety of employees, the progress of the work, certification, security clearances, work restrictions, radiation exposure and qualifications, may preclude rigid adherence to the low man principle; however, it is the intent to assign overtime work on the basis of the low man first when such factors are not present.

C. A separate overtime list shall be maintained for each overtime group within the classification and will report the name of each employee who is eligible for overtime assignment.

D. Overtime shall be recorded on the basis of hours paid.

E. The intent of the overtime charging process is to equalize, as well as possible, the hours on each of the group's overtime list. An employee will only be asked and charged for a maximum of eight (8) hours equivalent

142

143

work in any single shift. Refusal of overtime for one (1) shift will not preclude an employee from being asked for overtime nor charged for refused overtime in any subsequent shift. It is not the intent of the procedure to unreasonably pyramid hours charged for refused overtime.

F.     Overtime records will be brought up-to-date and made available in the work area for each group at intervals of approximately one (1) week. Overtime records should be posted in an appropriate work location.

3. ANNUAL RECORD RENEWAL

Overtime records shall be discontinued effective the end of the first full week in January each year. For the new reporting period the overtime group record will be adjusted as follows:

A.     The employee with the least amount of recorded overtime hours will begin the new reporting period with zero reported hours.

144

Other employee's overtime hours are also "zeroed" but their relative position on the overtime group list is maintained by added successive increments of .10 hours to the new start record.

At the end of each six (6) month period, either the Employer or the Union may request a review of the overtime experience and consideration may then be given to making such modification as may be mutually agreed to by the parties.

B.     The above procedure is to be utilized if the difference in hours between the low and high person in the overtime group exceeds twenty-five (25) hours. If the spread is twenty-five (25) hours or less, the low person's hours will be "zeroed", and those hours will be subtracted from all others in the overtime group.

4. DELETIONS FROM THE RECORD

An employee's name shall be deleted from the overtime distribution record if:

A.     The employee is medically restricted from working overtime based on the

145

recommendation of the Hanford Environmental Health Foundation.

B.   The employee is removed from the payroll for any reason.

C.   The employee is absent from work for a period of thirty (30) calendar days, excluding vacation.

## 5.  ADDITIONS TO THE RECORD

A.   New Hires

A new hire, for the purpose of this procedure only, shall be any employee with the exception of Apprentices, whose name has not appeared on any employee overtime list during the previous ninety (90) days. When adding the name of a newly hired employee to the group overtime record, his/her recorded hours shall be one (1) hour greater than the high employee in the group.

B.   Job Reassignment

When an employee is permanently moved from one overtime group to another overtime group, his/her recorded hours will be the average hours of the new group as of the date of reassignment.

C.   Removals and Additions

When an employee whose name has been removed from the overtime list by reason of absence or medical restriction and is returned to the overtime record, the employee's recorded hours shall be as follows:

(1)   If the period of absence from any list is ninety (90) days or less, the employee shall be returned or added to the group with the average hours of the group, effective the date of addition.

(2)   If the period of absence is more than ninety (90) days, the employee shall be added to the list with his recorded hours as one hour greater than the high employee in the group.

(3) Employees returned to the active employment rolls from ROF status will be added to the group at the average hours of the group.

D.   Temporary Assignment (within a classification)

In general practice an employee who has been assigned from his/her regular overtime group to another group on a temporary basis will be considered for overtime in the temporary assignment before other employees from outside the overtime group and should be asked last for overtime in the temporary assignment. The hours worked or refused while in such temporary assignment will be recorded in accordance with paragraphs 2.D. and 2.E. Upon return from temporary assignment, the employee is placed on the overtime list with all recorded hours. Additionally, the employee remains eligible for overtime in his/her "regular" overtime group.

6. Facility Closure Days

A.   Work performed by an employee on his/her regular shift schedule on his/her observed facility closure day shall not be considered as overtime and will not be recorded on the overtime distribution record.

B.   Work performed or refused by an employee outside his regular shift schedule on his observed facility closure day shall be considered as overtime and will be recorded.

7. APPRENTICE OVERTIME

The names of apprentices will not appear on group overtime records. Apprentices may be considered for overtime when, in the opinion of supervision, the apprentice is capable of performing the work and such overtime assignment does not interfere with classroom or associated training time. Upon promotion to journeyman status, the employee will be placed at the average hours of the assigned overtime group.

8. TEMPORARY UPGRADES

A.   Employees who are temporarily promoted to positions within the bargaining unit are eligible for overtime

In their upgraded position. Such employees will be considered for overtime in the temporary assignment before employees from outside the group. They will not normally be considered for overtime in their regular classification.

B. For periods involving upgrades of two (2) weeks or less, such employees may be scheduled for overtime on those days they are not acting in the upgraded status (normally their first or second day of rest) providing the master list for the respective seniority group has been exhausted.

C. For periods involving upgrades of more than two (2) consecutive weeks and less than thirty (30) days, employees who are temporarily promoted to positions outside of the bargaining unit (upgrade) will not be considered for overtime during such periods except for emergency conditions.

D. Employees who have been temporarily upgraded in excess of thirty (30) days will be removed from the group

150

overtime lists. Upon return such employees will be given the average overtime hours of the group as of the week that they return.

9. OVERTIME MEALS

A. Employees shall be provided with a meal and an opportunity to eat such meal on the Employer's time after completing approximately ten (10) consecutive hours of work (excluding the regular meal period) and at approximately six (6) hour intervals thereafter except as provided in (C) below.

B. Employees called in for emergency work shall be provided a meal and an opportunity to eat such meal on Employer time at approximately six (6) hour intervals thereafter except as provided in (C) below.

C. Notwithstanding the foregoing, meals will not be provided for employees in cases where the expiration of the six (6) hour period falls within one-half (1/2) hour of the time the employee is

151

to be relieved from his work assignment.

## 10. OVERTIME DISTRIBUTION

The Employer shall assign overtime within a classification as equally as practicable. In order to assure that the proper administration of the overtime procedures in the field will remain as stable as possible, such procedures will not be established by the Employer without prior discussion thereof with the Council and once established will remain in effect unless in their actual operation such procedures demonstrate themselves to be clearly impracticable or incapable of effecting an equitable distribution of overtime. A record of overtime assignments shall be kept and made available to the Steward on request.

## 11. OVERTIME STAFFING

It is understood by the Council that the nature of the Employer's operation may require overtime work and that, under such circumstances, the Council is obliged to encourage those it represents to work overtime, as requested by the Employer, in accordance with established procedures for distribution thereof.

## 12. OVERTIME GROUPS

The staffing of overtime work will be as follows:

1. The supervisory groups or the immediate work groups as established in the Appendix A's for the specific seniority group/classification.

2. The general area(s) within which the work group/supervisory group is located. This may involve multiple companies.

   a. 100 Areas
   b. 200 Areas
   c. 400 Area
   d. 300 Area
   e. 1100 Area
   f. 700 Area
   g. 600 Area

152

153

### 13. TEMPORARY EMPLOYEES

Temporary employees will not be asked to work overtime unless the overtime work has been turned down by the regular full-time employees in the overtime area. Reference Article XXV, Section 10.

## ATTACHMENT B
## EMPLOYEES PROMOTED FROM THE BARGAINING UNIT

The language below regarding employees promoted from the bargaining unit shall apply to all HAMTC affiliates.

Employees who are promoted from the bargaining unit will continue to accumulate seniority in their former seniority group provided that the employee does not exceed six (6) cumulative months outside the bargaining unit in any twenty-four (24) month period. Should the employee exceed six (6) cumulative months outside the bargaining unit in a twenty-four (24) month period, the employee's seniority shall be extinguished unless the Employer and the HAMTC Representative mutually agree to extend the six (6) month time limit.

154

155

## ATTACHMENT C
## 1997 INSURANCE, PENSION AND SAVINGS AGREEMENT

This Insurance, Pension and Savings Agreement, entered into between Fluor Daniel Hanford, Inc. (hereinafter referred to as the "Company"), and the Hanford Atomic Metal Trades Council, affiliated with the Metal Trades Department, American Federation of Labor - Congress of Industrial Organizations (hereinafter referred to as the "Council"), shall be applicable to and binding upon the Company, the Council, and employees of the Company at its Hanford Plant Operations at Richland, Washington (hereinafter called the "Hanford Plant"), who are represented by the Council under the 1997 Fluor Daniel Hanford, Inc./HAMTC Agreement (hereinafter referred to as "employees").

### TITLE I

#### Section 1

Subject to the provisions of Title II hereof, and with the exception noted in this Section 1, the Company and the Council agree that the Basic Life and Accidental Death and Dismemberment and the Short Term Disability Plans, the benefits and provisions of which are set forth in the applicable Summary Plan Description document, shall be made available to employees.

#### Section 2

The Company will make available to employees the Hanford Contractors Multi-Employer Defined Benefit Pension Plan for HAMTC-Represented Employees (hereinafter referred to as the "Pension Plan"), subject to the terms and conditions of the Plan, the provisions of which are set out in the Plan document.

#### Section 3

The Company will make available to employees the Hanford Contractors Multi-Employer Savings Plan for HAMTC-Represented Employees (hereinafter referred to as the "Savings Plan"), subject to the terms and conditions of such plan, the provisions which are set out in the Plan document.

#### Section 4

The Company agrees to make available to employees the Fluor Daniel Hanford, Inc. PPO

Medical Plan, currently adn.  .stered by CIGNA, subject to terms and provisions which are set forth in the Summary Plan Description document.

The Company, subject to Group Health Northwest's right to amend or terminate the plan on any premium due date, agrees to make available to employees the Group Health HMO Plan, the benefits and provisions of which are set forth in the Group Health HMO Summary of Benefits.

The Company, subject to Group Health "Options" right to amend or terminate the plan on any premium due date, agrees to make available to employees the "Options" Point of Service Plan, the benefits and provisions of which are set forth in the "Options" Service Agreement provided by Group Health.

## Section 5

The Company, subject to the insurance company's right to amend or terminate the policy on any premium due date, agrees that it will make available to employees the Personal Accident Insurance Plan, the benefits and provisions of which are set forth in the Summary Plan Description document.

## Section 6

The Company agrees to make available to employees the Fluor Daniel Hanford, Inc. Long Term Disability Plan, the benefits and provisions of which are set forth in the Summary Plan Description document.

## Section 7

The Company, subject to the insurance company's right to amend or terminate the policy on any premium due date, agrees that it will make available to the employees of Fluor Daniel Hanford, Inc. Dependent Life Insurance Plan, the benefits and provisions of which are set forth in the Summary Plan Description document.

## Section 8

The Company agrees that it will make available to the employees the Fluor Daniel Hanford, Inc. Dental Assistance Dental Plus Plans, the benefits and provisions of which are set forth in the Summary Plan Description document.

## Section 9

The Company agrees that it will make available to employees a Vision Care Plan. This coverage may be a stand-alone plan. This vision coverage will not be offered to those electing alternative medical plans provided such plans include similar vision care benefits.

## Section 10

The Company agrees that it will make available to the employees the Fluor Daniel Hanford, Inc. Travel Accident Insurance Plan, the benefits and provisions of which are set forth in the Summary Plan Description document.

## Section 11

Subject to the provisions of this Agreement, the Company, on its behalf, and the Council, on its behalf and on behalf of the employees, agree to accept the Plans mentioned in Sections 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10, hereof, and agrees to the terms and conditions thereof to the extent applicable to the employees.

160

## Section 12

It is expressly agreed that the parties hereto have had the right and opportunity to bargain collectively with reference to all matters pertaining directly or indirectly to insurance, pension, savings plan and any economic benefits or advantages which could or might be established by the Company in the form of insurance, pension or savings matters for the employees and their dependents and the Council, each of the parties voluntarily and unqualifiedly hereby waives any and all rights to require that the other party hereto bargain collectively during the term of this Agreement with respect to any such subjects or matters whether or not such matters are covered by this Agreement, except as specifically provided elsewhere in this Agreement, and whether or not such matters are within the knowledge or contemplation of any of the parties at the time of negotiation or execution of this Agreement.

The Council agrees that, during the terms of this Agreement, there shall be no strike, slowdown, sitdown, or other form of work stoppage arising out of or conducted in connection with any effort to induce modification of or amendments or additions to the insurance, pension and savings

161

benefits provided for by this Agreement, or the terms of conditions under which such benefits are provided.

## Section 13

A claim of an employee concerning his rights under the terms of the Short Term Disability Plan, the Basic Life Insurance and Accidental Death and Dismemberment Plan, the PPO Medical Plan, the Pension Plan, the Savings Plan, the Personal Accident Insurance Plan, the Long Term Disability Plan, the Dependent Life Insurance Plan, the Travel Accident Insurance Plan, the Dental Assistance and Dental Plus Plans, and the Vision Care Plan, may be processed in accordance with the Grievance Procedures set forth in Article XVII of the 1997 Fluor Daniel Hanford, Inc./HAMTC Agreement. However, no matter or controversy concerning the provisions of this Agreement or such Plans or the interpretation or application thereof shall be subject to any arbitration procedure by virtue of this or any other agreement between the parties or otherwise.

162

## Section 14

The Company agrees that during the terms of this Agreement:

(a) Subject to Section 1 of Title III and notwithstanding any provision of the Plan to the contrary, the Pension Plan, to the extent applicable to employees, shall not be terminated or amended so as to decrease pension benefits to the employees or increase the contributions by the employees, so long as this Agreement remains in effect.

(b) Subject to the provisions of Title II and notwithstanding any provisions in the Plans to the contrary, the PPO Insurance Plan, the Personal Accident Insurance Plan, the Long Term Disability Insurance Plan, the Dependent Life Insurance Plan, the Travel Accident Insurance Plan, the Dental Assistance Plan, the Dental Plus Plan and the Vision Care Plan, to the extent applicable to the employees, shall not be amended or terminated by the Company so long as this Agreement remains in effect.

(c) Subject to the provisions of Title IV and notwithstanding any provisions in the Plan to

163

the contrary, the Saving ... Plan, to the extent applicable to the employees shall not be amended or terminated by the Company so long as this Agreement remains in effect.

## TITLE II - INSURANCE

### Section 1

Nothing in this Agreement shall be construed to prevent the Company from making the Basic Life and Accidental Death and Dismemberment Plan, the Short Term Disability Plan, the Personal Accident Insurance Plan, the Long Term Disability Plan, the Dependent Life Insurance Plan, the Travel Accident Insurance Plan, the Dental Assistance Plan, the Dental Plus Plan, the Vision Care Plan, and the Group Health HMO and Options Plan available in whole or in part to others than the employees covered by this Agreement.

### Section 2

(a) To the extent that during the term of this Agreement there shall be in effect any state or federal law providing for the payment to any of the employees of benefits for non-occupational sickness and accident or

164

hospitalization, or for other health or sickness benefits, the Company without further collective bargaining may, as to such employees as shall be subject to such laws:

(1) Qualify the PPO Medical Plan, Short Term Disability Plan or Long Term Disability Plan in substitution for the Plan provided by such law, if permissible, making such modifications in such plan as it deems necessary or appropriate to obtain such qualifications.

(2) Otherwise comply with such law and either exclude from the PPO Medical Plan, Short Term Disability Plan, or Long Term Disability Plan all benefits of the nature provided by such law, or vary or amend such Plans to provide different or reduced benefits which would supplement those provided under such law.

In exercising such options, the Company may make such adjustment in the Company and employee contributions as it deems appropriate with respect to any differences in benefits and costs. However, the Company

165

will first notify the Council of and, upon request, will discuss with the Council any such proposed adjustment in the Plans and the Company and employee contributions and will endeavor to make such adjustment so that, in general, the total benefits available to the employees and their contributions will be as nearly comparable as practicable to the benefits and contributions provided for in the Plan for employees in states where no such laws are in effect.

(b) Employees affected by any such variations or amendments of the PPO Medical Plans, Short Term Disability and Long Term Disability Plans will be notified thereof.

**Section 3**

(a) The Company may at its option establish insurance plans under:  (1) a group insurance policy or policies issued by an insurance company or companies selected by the Company; (2) self-insurance; (3) a trust or trusts established by the Company; or (4) any combination of such methods; and shall have the right to change from time to time

166

such methods or the insurance company or companies, or the trust or trusts.

(b) The Company shall have the sole responsibility for the administration of the PPO Medical Plan, Basic Life and Accidental Death and Dismemberment, Short Term Disability Plan, the Dental Assistance Plan, the Dental Plus Plan, the Vision Care Plan, the Personal Accident Insurance Plan, the Travel Accident Insurance Plan and the Long Term Disability Plan and for the payment of all administrative expenses thereof.

(c) The parties agree that adjustments to the employees' premium costs for the PPO Medical Plan, Basic Life and Accident Death and Dismemberment and Short Term Disability Plan, the Dental Assistance Plan, the Dental Plus Plan, the Vision Care Plan, the Personal Accident Insurance Plan, the Travel Accident Insurance Plan and the Long Term Disability Insurance Plan may be necessary, on an annual basis, depending upon the Plan's operating experience.  If such adjustments are made, the adjustment involved will be automatically applicable to all employees enrolled in the Plan.

167

## Section 4

The Company shall have the sole responsibility for the administration of the Dependent Life Insurance Plan. The cost of this insurance plan, which is set by the insurance company and which may be increased or decreased once in a year, is borne by the participating employees. The Company absorbs the cost of the administrative operations it performs.

### TITLE III - PENSION

## Section 1

The establishment and continuation of the Pension Plan are contingent upon and subject to obtaining and retaining such approval of the Commissioner of Internal Revenue as the Company may deem necessary to obtain, including:

(a) The qualification of the Pension Plan under the provisions of Section 401 or other applicable provisions of the Internal Revenue Code, and

(b) The deductibility for income tax purposes under Section 404(a) or other applicable

provisions of the Internal Revenue Code or any and all payments made by the Company under the Pension Plan, if the Company desires or is required to establish such deductibility.

It is hereby agreed that the Company make, retroactively if it so elects, any modification or amendment of the Plan which may be necessary or appropriate in order to qualify or maintain such Plan and trust as meeting the requirements of said Sections 401 and 404(a) of the Internal Revenue Code or of any other applicable provisions of the federal tax laws or of any regulations issued thereunder now or hereafter from time to time in effect; provided, however, that if it shall be necessary at any time, in order so to qualify or maintain the Plan, to reduce pension benefits of the employees under the Plan, or to increase contributions by the employees or by the Company, the Council agrees to negotiate as to corresponding changes in the Plan if no agreement is reached, either party may terminate this Agreement to the extent applicable to the Plan.

## Section 2

The Company shall have the sole responsibility for administration of the Pension Plan in accordance with its provisions.

## Section 3

The establishment and continuation of the Pension Plan are contingent upon and subject to retaining such approval of the Commissioner of the Internal Revenue or other governmental agencies as the Plan Administrator deems necessary or advisable to obtain.

## Section 4

The Plan Administrator agrees to furnish upon request from the Council, for each calendar year in which this Agreement is in effect, a copy of all information which becomes a matter of public records concerning the Pension Plan which is filed by the Plan Administrator in accordance with the Public Law 93-406, the Employee Retirement Income Security Act of 1974. The Council agrees that by furnishing such information the Plan Administrator will fully comply with any statutory or other obligation to

170

supply the Council with information concerning the operation of the Pension Plan.

## TITLE IV - SAVINGS

## Section 1

Effective April 1, 1987, the Savings Plan was established for employees. Such employees are eligible to participate in the Savings Plan subject to the terms and conditions of the Plan.

## Section 2

The Plan Administrator shall have the sole responsibility for the administration of the Savings Plan, and for payment of all administrative expenses thereof.

## Section 3

The establishment and continuation of the Savings Plan are contingent upon and subject to retaining such approval of the Commissioner of the Internal Revenue or other governmental agencies as the Plan Administrator deems necessary or advisable to obtain.

171

## Section 4

The Plan Administrator agrees to furnish upon request from the Council, for each calendar year in which this Agreement is in effect, a copy of all information which becomes a matter of public record concerning the Savings Plan which is filed by the Plan Administrator in accordance with the Public Law 93-406, the Employee Retirement Income Security Act of 1974. The Council agrees that by furnishing such information the Plan Administrator will fully comply with a statutory or other obligation to supply the Council with information concerning the operation of the Savings Plan.

### TITLE V - DURATION

## Section 1

This Agreement between the Company and the Council shall become effective as of April 7, 1997, and shall, subject to the terms, continue in full force and effect as to the Company and the Council until the 31st day of March, 2002, except that it shall be terminable by the Company prior to that date in the event the Company shall cease to manage, operate and maintain the Hanford Plant of the Department of

172

Energy under Prime Contract DE-AC06-87RL10930 as amended, between Fluor Daniel Hanford, Inc. and the Department of Energy. Such termination shall be effective immediately upon the giving of written notice to the Council.

## Section 2

This Agreement for the term whereof shall be the exclusive and definitive agreement between the parties with respect to Insurance, Pension and Savings.

173

IN WITNESS WHEREOF, the parties hereto have caused their names to be subscribed to this Agreement by their duly authorized officers and representatives this seventh day of August, 1997, at Richland, Washington.

| | |
|---|---|
| HANFORD ATOMIC METAL TRADES COUNCIL METAL TRADES DEPARTMENT | FLUOR DANIEL HANFORD, INC. a subsidiary of FLUOR DANIEL, INC. |

AMERICAN FEDERATION OF LABOR-CONGRESS OF INDUSTRIAL ORGANIZATIONS

HAMTC represents that, pursuant to its Bylaws, it is the duly authorized bargaining agent for all the constituent local unions having members in the Fluor Daniel Hanford, Inc. bargaining unit, and is fully authorized to execute this Agreement on behalf

| | |
|---|---|
| s/ Gary L. Muth | s/ J. H. Hanna |
| Gary L. Muth | Jim H. Hanna |
| President, HAMTC | Director, Industrial Relations |
| | s/ Ben D. Corder |
| | Ben D. Corder |
| | Manager, Administrative Services & Oversight |

174

---

## ATTACHMENT D

July 18, 1997

Mr. Gary L. Muth, President
Hanford Atomic Metal Trades Council
P.O. Box 898
Richland, Washington 99352

Dear Mr. Muth:

ITEMS FOR CONTINUED DISCUSSION - REVISED

Since our last communication to you, there have been additions to the list of Local union/seniority groups with whom Fluor Daniel Hanford, Inc. wishes to continue discussions beyond the ratification date of the new FDH/Hanford Atomic Metal Trades Council Agreement. The revised list is as follows:

| Affiliate | Issue |
|---|---|
| IAFF, I-24 | Possible new fitness and medical standards for Firefighters |
| OCAW, I-369 | Development of a new Training Program for Seniority Group 060 |

175

| IBEW, 984 | Impact    a new requirement regarding written examination test score |
| OCAW, 1-369 | Hot Cell Technicians |
| IBEW, 984 | Industrial Hygiene Technicians |
| OCAW, 1-369 | Job scope and definitions for Seniority Group 056 |
| IBEW, 77 | Job scope, training, and job definitions |
| Teamsters, 839 | Certifications and compensation for the herbicide spraying crew |

In addition to the list above, there will be discussions with HAMTC regarding:

- Dental Committee to meet within 90 days of ratification to determine the path forward

- Development of details of 10-hour and 12-hour shifts within six months following ratification

Very truly yours,

James H. Hanna, Director
Industrial Relations

# ATTACHMENT E

May 23, 1997

Joel Sorenson
Fluor Daniel Hanford, Inc.
Box 1000, MSN H2-23
Richland, WA 99352

Re:  Appointment Times for Vision Services

Dear Joel,

This letter is to confirm our agreement regarding appointment availability in our Vision Center.  Our policy will be, that if we are unable to provide routine vision appointments within a four week period of time, that we will offer outside optometry services to our members. Attached is a list of the current outside optometric providers who are credentialed and available for this purpose.  There are several others in the credentialing process and those names will be made available as they are approved.

If you have any questions, or if I can be of any further service, please feel free to call.

178

Sincerely,

Robert Burden, RHU
Tri-Cities District Director

Attachment

| OK To Use Optometrist in the Tri-Cities District |||
| NAME | CLINIC | ADDRESS |
| --- | --- | --- |
| Gerald Berges, OD | Center Vision & Contact Lens Clinic | 4015 W Clearwater, Suite A, Kennewick WA 99336 |
| Jannet Calvert, OD | Tri-City Eye Clinic | 4212 W. Clearwater, Kennewick WA  99336 |
| Daniel Jacks, OD | Family Eye Care | 7901 W Grandridge, Kennewick WA 99336 |
| Greg Luehrs, OD | Center Vision & Contact Lens Clinic | 4015 W Clearwater, Suite A, Kennewick WA 99336 |
| Myles McCartney, OD | Uptown Vision Center | 1335 Geo Wash Way, Richland WA 99352 |
| Douglas Quesnell, OD | Family Eye Care | 7901 W Grandridge, Kennewick WA 99336 |
| Kelly Cochrane, OD | Valley Vision Clinic | 22 West Main, Walla Walla WA 99362 |
| Steven J. Davis, OD | Alder street Place | 614 East Alder, Suite 1, Walla Walla WA 99362 |

179

| NAME | CLINIC | ADDRESS |
|------|--------|---------|
| Paul Jubb, OD | Blue Mt. Vision Clinic | 1711 Dalles Military Rd, Walla Walla WA 99362 |
| Becky Musik, OD | Valley Vision Clinic | 22 West Main, Walla Walla WA 99362 |
| Luther Ness, OD | Valley Vision Clinic | 22 West Main, Walla Walla WA 99362 |
| Allen Panasuk, OD | Blue Mt. Vision Clinic | 1711 Dalles Military Rd, Walla Walla WA 99362 |
| Dennis Poffenroth, OD | Valley Vision Clinic | 22 West Main, Walla Walla WA 99362 |
| Roseanne Schneller, OD | Blue Mt. Vision Clinic | 1711 Dalles Military Rd, Walla Walla WA 99362 |
| Harry Wiessner, OD | Alder street Place | 614 East Alder, Suite 1, Walla Walla WA 99362 |

180

## ATTACHMENT F

February 25, 1997

Mr. G. L. Muth, President
Hanford Atomic Metal Trades Council
P. O. Box 898
Richland, WA 99352

Dear Mr. Muth:

TEMPORARY ASSIGNMENTS/LABOR ASSETS
MANAGEMENT PROGRAM

Ref: Article VII, Section 13 and Article XXIV

During our discussions regarding a "temporary assignment" or regular full time employees for a period of sixty (60) working days or less, the parties agreed that upon written request of either of them, meetings will be held during the month of August regarding the desirability of increasing or decreasing the period of sixty (60) working days. If no agreement is reached, the period of working days reverts to the earlier number of forty-five (45). This letter is to formalize that agreement.

181

Further, this letter will acknowledge that tentative agreement has been reached on Article XXIV, Labor Assets Management Program.

The Council may indicate its concurrence of these agreements by signing and returning one copy of this letter to my office.

Very truly yours,

J. H. Hanna, Director
Industrial Relations

Concurrence:  s/ Gary L. Muth    2-27-97
              HAMTC           Date

182

## ATTACHMENT G

February 19, 1997

Mr. G. L. Muth, President
Hanford Atomic Metal Trades Council
P. O. Box 898
Richland, WA  99352

Dear Mr. Muth:

LABOR ASSETS MANAGEMENT PROGRAM

During the negotiation discussions regarding Article XXIV - Labor Assets Management Program (LAMP), the Council expressed a concern that undue delays in training are occasionally experienced which extended the 'time on assignment before reassignment is allowed' beyond a reasonable period.  If the Council will inform Industrial Relations of such undue delays, the issue will be investigated and correction, if warranted, will be made.

The Council also expressed a position that held that an employee who is "forced" to an assignment should not be required to remain in the assignment for twelve (12) months after having attained the required

183

certifications/qualificatio.... The Employer is willing to allow such employee to be reassigned in a shorter period of time if both parties, HAMTC and the Employer are in agreement.

Very truly yours,

J. H. Hanna, Director
Industrial Relations

184

## ATTACHMENT H

May 22, 1997

Mr. G. L. Muth, President
Hanford Atomic Metal Trades Council
P. O. Box 898
Richland, WA  99352

Dear Mr. Muth:

WORK CONTRACTED OUTSIDE

In the administration of Article XVI, "Work Contracted Outside," it is acknowledged that there may be instances when the work is contracted out; therefore, the following procedure has been developed to ensure that if such an event occurs it has been carefully reviewed and considered by both the Employer and the Union.

In this regard, the Employer pledges to administer Article XVI, "Work Contracted Outside," in good faith and in the spirit of cooperation with the Hanford Atomic Metal Trades Council.

185

Very truly yours,

J. H. Hanna, Director
Industrial Relations

Attachment

## MANAGER - PROCUREMENT

1. Receive and review all requests for procurement actions (usually fabrication and/or services) that might affect the HAMTC-represented employees and that are or are not accompanied by a completed "Turndown" document that assigns the work to offsite resources.

2. Ensure that the Labor Leasing Manager has approved the "Turndown" document before proceeding with procurement actions.

3. A change in the description of the Request for Procurement Action, before the purchase order is place offsite, must be reviewed with the Labor Leasing Manager and the HAMTC before further action is taken. A second "Turndown" may be required.

4. After the purchase order has been placed, any instances where the offsite work is to be modified in scope, quantity, specifications, delivery date, etc., must be referred to the Labor Leasing Manager and the HAMTC for review before agreeing to such modification.

5. Direct questions and/or challenges to the Labor Leasing Manager (Ron Lee) or designee of Industrial Relations.

## MANAGER - LABOR LEASING

1. Review all work turndown documents and take appropriate action.

2. Receive and evaluate questions and/or challenges from Procurement regarding "contracting out" and take appropriate action.

3. Receive and evaluate questions and/or challenges from HAMTC regarding "contracting out" and take appropriate action.

4. Take necessary steps to ensure that management of all affected contractors are

186

187

aware of and follow the provisions of Article XVI, "Work Contracted Outside," of the FDH/HAMTC Agreement. This includes the requirement for following the provisions of the "Turndown Procedure."

5. A joint FDH/HAMTC committee will review procurement and P-card records on a quarterly basis.

188

---

Requesting Contractor _____    Point of Contact Name _____
Date _____    Phone # _____

## TURNDOWN CHECK SHEET

Description of the work:

Are the following elements available to do the work?

| | Yes | No |
|---|---|---|
| Personnel | | |
| Including Temporaries | — | — |
| Including CAP | — | — |
| Equipment/Facilities | — | — |
| Technology (skills) | — | — |

Ability to meet the required completion date of _____ (If unable to meet the required completion date, the "customer" will reconsider the date to ensure it is realistic and valid.)

If there is a "no" answer to any of the above questions, proceed with the turndown procedure.

Discussion (with all pertinent information, included a list of appropriate affiliates and projected manhours) held with the appropriate

189

HAMTC representatives and the IR representative on

_____    _____
Date                          Time

What alternate solution was suggested?  (HAMTC has until end of second working day after discussions to provide alternate solution to work turndown, unless the time is extended by mutual agreement.)

|                                          | Yes | No |
|------------------------------------------|-----|----|
| Is the alternate solution acceptable?    | ___ | ___ |

Why not?

Assigned to
Plant Forces          Date____          ___  ___

Assigned to
Offsite Resources  Date____  PO#____  ___  ___

Name and Title _____ Date_____

Approved _____  _____
              Labor Leasing Manager    Date

190

## TRACKING THE OFFSITE WORK

Purchase Order _____

This record will be maintained for each purchase order that was placed as a result of bargaining unit work turndown.

1.  When was the order placed offsite and with whom?

2.  Promised delivery date.

3.  Actual delivery date.

|                                                    | Yes | No |
|----------------------------------------------------|-----|----|
| 4.  Was the delivered product reworked by HAMTC-represented employees? (HAMTC to provide this information.) | ___ | ___ |

5.  Was there a negotiated revision of the scope of work or the delivery date?  If so, describe.

Did this necessitate another turndown?          ___  ___

Was a review made by the Labor Leasing Manager or his designee and the HAMTC?          ___  ___

191

## *ATTACHMENT I*
## INTELLECTUAL PROPERTY AGREEMENT

Agreement made by and between Fluor Daniel Hanford, Inc.; a Washington corporation, having a place of business at the Hanford Site in Richland, Washington (hereinafter referred to as the "COMPANY"), and being a subsidiary of The Fluor Daniel Corporation, a California corporation (hereinafter referred to as "Fluor Daniel"), and

_____.
(Employee name and payroll number)

In consideration for my employment or continued employment by the COMPANY, I agree that:

1. For the purposes of the Agreement, the following words shall have the following meanings:

   a. "Confidential Information" means information which is disclosed to me, known by me, or generated by me as a consequence of my employment with the COMPANY and is not generally known outside the COMPANY and Fluor Daniel and is related to the COMPANY's or Fluor Daniel's business. "Confidential Information" is intended to include, but is not limited to, trade secrets, inventions, processes, formulas, systems, computer programs, plans, programs, studies, techniques and any and all business information.

   b. "Developments" means all inventions whether or not patentable, confidential information, computer programs, copyrights, trademarks or other intellectual property, made, conceived, or authored by me, alone or jointly with others, while employed by the COMPANY, whether or not during normal business hours or on COMPANY premises, that are within the existing or contemplated scope of the COMPANY's or Fluor Daniel's business or of the companies which Fluor Daniel owns or controls at the time such developments are made or which result from any work I or others may do for or on behalf of the COMPANY, Fluor Daniel or such companies.

192

193

2. NOTICE: No provision in the Agreement is intended to require assignment of any of my rights in an invention for which I can prove no equipment, supplies, facilities, or trade secret information of the COMPANY or Fluor Daniel was used and was developed entirely on my own time; and which I can prove (1) relates neither to the business of the COMPANY or Fluor Daniel or to the actual or demonstrably anticipated research of development of the COMPANY or Fluor Daniel; or (2) does not result from any work performed by me for the COMPANY or Fluor Daniel.

To the extent compatible with applicable state law, the provisions of the preceding paragraph do not apply to an invention which is required to be assigned by the COMPANY to the United States Government.

3. I will not disclose to or induce the COMPANY, Fluor Daniel or companies which Fluor Daniel owns or controls to use confidential information or trade secrets of others.

4. During my employment with the COMPANY and thereafter, I will treat all confidential information as secret and I will never use or disclose or authorize anyone else to use or disclose such confidential information except as is expressly permitted by the COMPANY in performance of my designated duties to the COMPANY. I will diligently protect all confidential information against loss by inadvertent or unauthorized use of disclosure.

5. All developments are the property of the COMPANY and I hereby assign to the COMPANY all my rights to such developments in all countries.

6. In addition to other rights or remedies the COMPANY may have, the COMPANY and Fluor Daniel shall have a perpetual, royalty-free, nonexclusive license to fully utilize for any purpose all inventions, computer programs, copyrights made, conceived, or authored by me, alone or jointly with others, within one year of termination of my employment with the COMPANY, related to work I performed during my tenure of employment with the COMPANY and which utilized confidential information.

7. I will promptly submit to the COMPANY written disclosure of all inventions, whether

194

195

or not patentable, which are made or conceived by me, alone or jointly with others, while I am employed by the COMPANY.

8. Upon request by the COMPANY at any time during my employment with the COMPANY and thereafter I will:

    a. Submit to the COMPANY written disclosures of all intellectual property made, conceived, or authored by me, alone or jointly with others, while employed by the COMPANY, and

    b. Provide proper assistance and execute all paper deemed by the COMPANY to be necessary to preserve legal protection for all developments without charge to the COMPANY, but at the expense of the COMPANY.

9. All written materials and other tangible objects, including copies, made or compiled by me or made available to me in the course of my employment, shall be the property of the COMPANY and shall be delivered to the COMPANY upon termination of my employment or at any other time upon request.

10. I hereby waive any claim for award or compensation under the provisions of the Atomic Energy Act of 1954, as amended, with respect to any development made or conceived in the course of or under any contract with any agency of the United States Government.

11. In order to ensure compliance with the COMPANY's contractual obligations to the United States Department of Energy (hereinafter referred to as "DOE") and with the COMPANY's conflict of interest procedures, I agree as a condition of my employment or continued employment with the COMPANY that I shall not undertake or continue in any consultant or other comparable employment services without first disclosing such proposed services to the COMPANY and obtaining the COMPANY's written approval. The term "consultant or other comparable employment services" as used in the paragraph shall mean those services performed for another DOE contractor in the same or related energy field or another organization which entail the rendering of expert or professional advice and which are likely to conflict with

the activities or interest of the COMPANY or DOE.

12. The law of the State of Washington will govern the interpretation, validity and effect of the Agreement without regard to its place of execution or its place of performance. Should I violate this Agreement, inadvertently or otherwise, I acknowledge that irreparable harm could result to the COMPANY and that the COMPANY shall be entitled to any remedy, legal or equitable, to correct any harm which results from such violation.

13. This Agreement may not be superseded, amended, or modified except by a written agreement signed by me and the General Counsel of the COMPANY or his or her delegate.

14. If any provision of this Agreement is held to be unenforceable for any reason, it shall be conformed to prevailing law rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of the Agreement shall be deemed valid and enforceable to the fullest extent possible. If

198

the COMPANY decides not to exercise any of its rights under this Agreement or to take no action against any violation, such decision shall not affect the exercise of such right or taking of any action at another time.

15. There is no other agreement or restriction with prevents the performance of my duties under this Agreement.

I acknowledge that I have read and that I understand this Agreement. I understand that to the extent applicable it remains in effect following my employment with the COMPANY. I also understand this Agreement is legally binding upon me and it may be transferred by the COMPANY to any of its successors or assignees.

By _____ Date_____
    (Employee)

199

## *ATTACHMENT J*
## OUT OF AREA COVERAGE

### FLUOR DANIEL HANFORD, INC.

### GROUP HEALTH NORTHWEST/OPTIONS

### SUMMARY OF BENEFITS

**Definitions:**

<u>Out of Area</u> - Emergencies are covered by Group Health Northwest and Options anywhere in the world. However, you should notify Group Health Northwest as soon as reasonably possible (within 48 hours) if you are admitted to the hospital to ensure that the cost of your care is covered.

<u>Emergency</u> - If a prudent person would believe there is life- or limb-threatening event or illness and seeks emergency care, it will be covered. Examples of an emergency might include serious breathing difficulties, unconsciousness, uncontrolled bleeding, major burns, crushing chest pain, or convulsions. In the event of a medical emergency, someone should call 9-1-1 or the local emergency number. Once the immediate situation is under control, it is very important to contact your Primary Care Provider. If you are out of town, you may also call the Group Health Consulting Nurse at 1-800-826-3620 or (509) 324-6464 collect.

<u>Urgent Care</u> - Urgent care is covered for conditions that are not life-or-death, but must be resolved quickly to prevent them from becoming more serious. Sprains, small lacerations, respiratory ailments, or fever are examples of conditions which may require urgent care. If you are out of town, please call the Group Health consulting nurse at 1-800-826-3620 or (509) 324-6464 collect. In many areas, the consulting nurse can direct you to an affiliated facility where you may receive care and make your regular copayment.

<u>Kaiser Permanente</u> - Effective 9/1/97, Group Health and Options members will be able to use Kaiser Permanente clinics and hospitals when traveling (up to 90 days), or the reciprocity program for those living in areas served by Kaiser Permanente (currently 17 states and Washington, D. C.).

## ATTACHMENT K
## SENIORITY GROUPS/LOCAL UNIONS

### HANFORD ATOMIC METAL TRADES COUNCIL

| SENIORITY GROUPS | Job Titles | Local Unions |
|---|---|---|
| 001 | Storekeepers | Teamsters, Local 839 |
| 002 | Locomotive Engineers<br>Conductors<br>Switchmen | Operating Engineers, Local 280 |
| 004 | Nuclear Chemical Operators<br>Operator Trainees<br>D&D Workers | Nucleonics Alliance, OCAW, Local 1-369 |
| 005 | Stationary Operating<br>Engineers<br>Chlorinators | Operating Engineers, Local 280 |

| SENIORITY GROUPS | Job Titles | Local Unions |
|---|---|---|
| 008 | Auto Mechanics-Jrm.<br>Auto Mechanics-Appr.<br>Automotive Machinists-Jrm. | Machinists, Local 1951 |
| 08B | Auto Parts Handlers | Machinists, Local 19! |
| 009 | Heavy Duty Mechanics | Operating Engineers, Local 280 |
| 009A | Heavy Equipment Parts Handlers | Operating Engineers, Local 280 |
| 010 | Diesel Electric Locomotive Mechanics | Operating Engineers, Local 280 |
| 011 | Sheetmetal-Jrm.<br>Sheetmetal-App. | Sheetmetal Workers, Local 242 |
| 012 | Track Inspectors<br>Track Equipment Operators-J<br>Trackmen | Operating Engineers, Local 280 |
| 013 | Crane Operators | Operating Engineers, Local 280 |
| 013A | Oilers (Heavy Equipment) | Operating Engineers, Local 280 |
| 013B | Heavy Equipment Operators | Operating Engineers, Local 280 |

202

203

**204**

| SENIORITY GROUPS | Job Titles | Local Unions |
|---|---|---|
| 014 | Heavy Truck Drivers, Lube and Tiremen, Servicemen | Teamsters, Local 839 |
| 015 | Carpenters-Jrn. | Carpenter/Millwright, Local 2403 |
| 016 | Janitors, Floor Servicemen | Operating Engineers, Local 280 |
| 018 | Laboratory Instrument Specialists, Instrument-App. | IBEW, Local 77 |
| 021 | Linemen, Assistant Linemen | IBEW, Local 7 |
| 022 | Electricians-Jrn., Electricians-App. | IBEW, Local 77 |
| 22A | Substation Operators | IBEW, Local 77 |
| 22C | Substation Electricians | IBEW, Local 77 |
| 22D | Meter Relay Technicians | IBEW, Local 77 |

**205**

| SENIORITY GROUPS | Job Titles | Local Unions |
|---|---|---|
| 023 | Millwrights-Jrn., Millwrights-App. | Carpenter/Millwright, Local 2403 |
| 024 | Plumber Steamfitter-Jrn., Plumber Steamfitter-App. | Plumber/Steamfitters, Local 598 |
| 025 | Painter/Carpet Installer-Jrn., Painter-Jrn. | Painters, Local 178 |
| 029 | Locksmith and Safemaster-Jrn., Locksmith and Safemaster-App. | Machinists, Local 1951 |
| 031 | Cement Finisher-Plasterer-Jrn., Cement Finisher-Plasterer-Trn. | Nucleonics Alliance, OCAW, Local 1-369 |
| 032 | Master Process Crane Operators, Crane Operators (Process) | Operating Engineers, Local 280 |
| 033 | Boilermakers-Jrn., Boilermakers-App. | Boilermakers, Local 242 |
| 034 | Glazier/Glassworker-Specialist, Glazier/Glassworker-Jrn. | Painters, Local 1789 |
| 035 | Ironworker/Riggers-Jrn. | Ironworkers, Local 14 |

| SENIORITY GROUPS | Job Titles | Local Unions |
| --- | --- | --- |
| 037 | Insulators-Jrm.<br>Insulators-App. | Insulators, Local 120 |
| 038 | Sign Painters-Jrm. | Painters, Local 1789 |
| 039 | Machine Shop Stock & Tool Attend.<br>Stock and Tool Attend. | Machinists, Local 1951 |
| 040 | Welders | Plumbers/Steamfitters, Local 598 |
| 041 | Firefighters-Platoon<br>Firefighters-Platoon-EMT<br>Firefighters-Area<br>Firefighters-Area-EMT<br>Firefighters-Paramedic<br>Firefighters-Paramedic-Platoon<br>Paramedic-Platoon | IAFF, Local 1-24 |
| 049 | Machinists-Jrm.<br>Machinists-App.<br>R&D Machinists | Machinists, Local 1951 |
| 054A | Health Physics Technicians | IBEW, 984 |
| 055 | Auto Body Repair/Painter-Jrm. | Machinists, Local 1951 |

206

| SENIORITY GROUPS | Job Titles | Local Unions |
| --- | --- | --- |
| 056 | Shop Material Take-Off Coord./Sr.<br>Shop Material Take-Off Coord. | Nucleonics Alliance, OCAW, Local 1-369 |
| 060 | Chemical Technologists-Sr.<br>Chemical Technologists | Nucleonics Alliance, OCAW, Local 1-36` |
| 061 | Hot Cell Technicians | Nucleonics Alliance, OCAW, Local 1-369 |
| 062 | Industrial Hygiene Technicians | IBEW, Local 984 |
| B00 | Sr. Operations Personnel-Lead<br>Sr. Operations Personnel<br>Sr. Tape Librarian<br>Data Entry Personnel<br>Data Center Lead Personnel | Nucleonics Alliance, OCAW, Local 1-369 |
| B18 | Instrument Specialists-Master Craftsmen<br>Instrument Specialists | IBEW, Local 77 |

207

208

| SENIORITY GROUPS | Job Titles | Local Unions |
|---|---|---|
| B19 | Sr. Reproduction-Lead<br>Reproduction-I<br>Reproduction Operator-Lead<br>Reproduction Operator<br>Copy Camera Operator<br>Stock Attendant-Bindery Operator | Operating Engineers, Local 280 |
| B22 | Communication Specialists-Master Craftsmen<br>Communication Specialists | IBEW, Local 77 |
| B59 | Switchboard Operators | IBEW, Local 77 |

# EXHIBIT B

ARBITRATION OPINION AND AWARD

OF

M. ZANE LUMBLEY

FLUOR DANIEL HANFORD, INC.

and

HANFORD ATOMIC METAL TRADES COUNCIL, AFL-CIO

Grievance: Movement of Equipment by Non-Bargaining Unit Members

FMCS Case No. 990513-11169-7

Date Issued: June 10, 2000

RECEIVED

JUN 1 3 2000

C. K. MacLeod

APPENDIX B

# OPINION

## PROCEDURAL MATTERS

The Arbitrator was selected by mutual agreement of the parties in accordance with XVII of the controlling collective bargaining agreement (Joint Exhibit No. 1, hereinafter the "Agreement"). A hearing was held before the undersigned on March 16, 2000, in Richland, Washington. Fluor Daniel Hanford, Inc. (hereinafter the "Company" or "Employer") was represented by its Chief Labor Counsel Charles K. MacLeod. Hanford Atomic Metal Trades Council, AFL-CIO (hereinafter the "Union") was represented by Kenneth J. Pedersen of the law firm of Davies, Roberts & Reid, LLP. At the hearing, witnesses testified under oath and the parties presented documentary evidence. At the close of hearing, the parties agreed upon the filing of posthearing briefs and timely briefs were received by the Arbitrator from both parties on May 4, 2000.

## ISSUE

The parties agreed upon the following statement of the issue to be resolved in this matter:

1. Did the Company violate the Agreement by contracting out the move of COGEMA Engineering Corporation from 1200 Jadwin to the Stevens Center in October and November of 1998?[1]

2. If so, what is the appropriate remedy?

---

[1] The parties stipulated that COGEMA Engineering is an "enterprise company" as referenced in the introduction on page "v" of the Agreement which is bound by the terms of the Agreement for all work performed under the Project Hanford Management Contract and that, for purposes of this hearing only, COGEMA and Fluor Daniel Hanford may both be referred to as the "Company."

1

## RELEVANT PROVISIONS OF THE AGREEMENT

The relevant provisions of the Agreement are:

**(Introduction, page v)**

This Agreement is made and entered into this seventh day of August 1997 by and between Fluor Daniel Hanford, Inc., its successors, hereinafter called "the Employer," and the Hanford Atomic Metal Trades Council, AFL-CIO, hereinafter called "the Council," and is applicable to all work done under the Project Hanford Management Contract, by the work force defined in Article I of the Collective Bargaining Agreement.

Fluor Daniel Hanford, Inc. team members and their successors also will adhere to this Collective Bargaining Agreement for work under the aforementioned Project Hanford Management Contract. Team members include major subcontractors, subcontractors and enterprise companies.

## ARTICLE I
## UNION RECOGNITION

1.  The Employer, in the operation of all its Hanford contracts, agrees to recognize the Hanford Atomic Metal Trades Council as the sole collective bargaining representative in all matters pertaining to wages, hours, and working conditions, for all employees in the bargaining unit as defined by the National Labor Relations Board in all applicable certifications and recognitions and whom it employs at and for the Project Hanford Management Contract . . . .

. . .

## ARTICLE II
## MANAGEMENT RIGHTS

1.  Subject only to any express limitations stated in this agreement, or in any other agreement between the Employer and the Council, the Employer retains the exclusive right to manage its business which shall include, (but not be limited to), the right to determine the methods and means by which its operations are to be carried on, to direct the workforce, and to conduct its operations in a safe and efficient manner, and the right to discipline or discharge employees for reasonable and just cause provided that the exercise of management rights shall not conflict with the provisions of this agreement, including use of the Grievance and Arbitration procedure.

2

### ARTICLE V
### JURISDICTION

1.   In the assignment of work, the Company shall recognize the established seniority groups and their established jurisdiction. It is agreed, however, that employees may be temporarily assigned work outside their established seniority groups in situations which leave the Employer no reasonable alternatives. Disputes regarding such assignments are subject to the grievance procedure, but the work shall be carried on as assigned pending the settlement.

. . .

4.   It is the Employer's intent to assign all regular maintenance work in engineering, research and laboratory facilities to bargaining unit personnel.

The necessities of the research and development function are such that some manual work will be performed by technical or professional personnel; however, insofar as practicable, it is the Employer's intent to utilize bargaining unit craftsmen on those phases of the work which do not require performance by technical or professional personnel in furtherance of their research, study or observation. In making working assignments, the Employer will act in accordance with this statement of policy.

### ARTICLE XIV
### GENERAL PROVISIONS

. . .

This Agreement and Hanford Multi-Company Pension and Insurance Plans represent the complete understanding of the parties any practice, term or condition not expressly contained herein need not be recognized.

### ARTICLE XVI
### WORK CONTRACTED OUTSIDE

1.   The Employer intends to maintain a work force consistent with scheduled requirements, and under those conditions, to make every effort, consistent with the Project Hanford Management Contract, to provide regular employment for its bargaining unit employees before work is contracted outside. . . .

. . .

3

*ARTICLE XVIII*
**ARBITRATION**

. . .

2.   The Arbitrator shall not have the authority to add to, disregard, or to modify any of the terms of this Agreement . . . .

. . .

*ARTICLE XXVI*
**AUTHORITY**

. . .

1.   The Council is represented in its dealings with the Employer by the General Counsel or the President, Hanford Atomic Metal Trades Council, subject to the Bylaws of that organization, and the Employer is represented by the President, Director of Industrial Relations, Manager Administrative Services & Oversight, Chief Labor Counsel, or such representative as the President of Fluor Daniel Hanford, Inc. shall specifically designate in writing.  It is understood and agreed that the incumbents of the aforesaid positions have authority on behalf of the Council and the Employer respectively to modify this Agreement, and otherwise to bargain collectively and that no agreements, arrangements or understandings shall be binding upon the parties hereto unless executed in writing by such authorized representative of the Council and the Employer.

**FACTS**

The Employer and Union have been parties to a succession of collective bargaining agreements on behalf of a number of seniority groups of production and maintenance employees employed on the Hanford Nuclear Reservation near Richland, Washington, pursuant to the Employer's Project Hanford Management Contract with the United States Department of Energy.  As noted in footnote 1, *supra*, the parties stipulated, referencing the Introduction to the Agreement set forth above, that enterprise companies such as COGEMA Engineering Corporation, hereinafter "COGEMA," are

4

also bound by the terms of the Agreement with respect to covered work. COGEMA provides certain engineering and technical services to Fluor Daniel Hanford. In line with the Department of Energy's goal of diversifying the economy of the Tri-Cities, Washington, area, COGEMA also actively seeks non-Hanford commercial work for its personnel to perform.

On October 30, October 31 and November 1, 1998, COGEMA hired Bekins Northwest to move its office furniture, equipment and supplies from the Tri-City Professional Center located at 1200 Jadwin Avenue to 2425 Stevens Center, both located in Richland, Washington, outside the boundaries of the Hanford Reservation. It is undisputed that the furniture, equipment, and supplies moved were owned by COGEMA, that it used its own corporate funds to pay Bekins $13,562.63 to perform the move and that neither the Department of Energy nor any government contractor reimbursed COGEMA for the cost of the move. The parties stipulated that the physical activity involved, i.e. the movement of the materials at issue and the driving of the sort of trucks required, is work traditionally performed by Union-represented teamster employees.

As noted above, COGEMA actively seeks to perform non-Hanford business in the Tri-Cities area. In this connection, although its Director of Contracts and Acquisitions Talbot testified that, as of the time of the move, only some 10% of the documents moved by Bekins was related to Hanford projects, he also testified that 93% of the work then being performed by COGEMA was Hanford work. According to Talbot, by the time of the hearing herein, the commercial aspect of its total work stood at perhaps 10%, with the remaining 90% continuing to be Hanford-related work.

When the Union learned that COGEMA had used Bekins rather than bargaining

unit employees to perform the move, it grieved. The dispute came on for arbitration before the undersigned when the parties were unable to resolve it.

## DISCUSSION AND ANALYSIS

The Union asserts that the work involved here should have been assigned to Union-represented employees by the terms of the Agreement, including the Introduction at page v and Article V, in particular. It also argues that the Employer is bound by Union Exhibit No. 1, a separate agreement executed on October 28, 1996, in settlement of an earlier grievance in which it was agreed, *inter alia*, that "the movement of all other furniture for Fluor Daniels [sic] Hanford or any of their contractors will be performed by Metal Trades Teamsters." The Union contends that both findings are required since it has been established that by far the majority of the work being performed by COGEMA as of the time of the move was Hanford-related. Accordingly, the Union seeks a finding that the Employer violated the Agreement by the use of Bekins rather than represented employees. By way of remedy, the Union requests the Arbitrator to issue a cease and desist order with back pay at the contractual overtime rate for the 347.75 man hours charged by Bekins and to retain jurisdiction over said remedy for a period of ninety days.

The Employer argues no violation of the Agreement occurred. In its view, COGEMA's decision to use Bekins to perform the move was appropriate in view of the language of the Agreement limiting its coverage, including the protection against subcontracting, to Hanford work. It notes the property moved was not government property, the two locations involved were not on government property, and the move was neither paid for nor reimbursed by the government. Thus, according to the Employer, the

6

use of Bekins was privileged by the Agreement's management rights language. The Employer also contends that Union Exhibit No. 1 is not binding since it was not signed by the individuals specified in Article XXVI of the Agreement, was reached in settlement of a jurisdictional dispute between Building Trades crafts and Metal Trades Teamsters, and was not codified in the subsequently-negotiated Agreement as required by the zipper clause set forth at Article XIV thereof. Accordingly, the Employer seeks dismissal of the grievance.

Having now had the opportunity to consider carefully the entire record in this matter, including the briefs of the parties, I have determined to agree with the Union that the Company violated the Agreement by contracting out the move of COGEMA Engineering Corporation from 1200 Jadwin to the Stevens Center in October and November of 1998. The discussion which follows will center on those considerations I found controlling.

It is stipulated that COGEMA is an enterprise company bound by the terms of the Agreement. It is also clear from the Introduction to the Agreement that the Agreement ". . . is applicable to all work done [by the relevant work force] under the Project Hanford Management Contract . . . ." Thus I am not convinced the fact that neither of the two buildings involved in the move at issue was located on the Hanford reservation should control.

Nor do I believe the fact that COGEMA actively seeks and actually performs commercial work not involving Hanford removes a relocation of its offices from the coverage of the Agreement. This is so because it is conceded that, at the time of the move, some 93% of COGEMA's work was Hanford-related. Indeed, by the time of the

7

hearing, that share had decreased, at most, to 90%. Thus, even assuming Talbot's other estimate that only 10% of the documents actually moved were Hanford-related, it is clear that the vast majority of its operations was devoted to support for the Project Hanford Management Contract.[2]

I also believe it is irrelevant who owned the property moved or who wrote the check in payment of the move. There is nothing in the Agreement which exempts unit work from the subcontracting prohibition set forth in Article XVI on the basis of ownership or financial responsibility. The important consideration, instead, is whether the work is covered work. Here, the parties stipulated that the sort of physical moving of property and the driving of the required trucks is maintenance work traditionally performed by represented teamsters. Thus, since COGEMA was an enterprise company engaged primarily in Hanford-related work, the Employer was not privileged by the management rights language set forth in Article II of the Agreement to assign the work of moving the relevant offices to an outside entity in disregard of the provisions of Article V requiring the assignment of "all regular maintenance work in engineering, research and laboratory facilities to bargaining unit personnel."

Accordingly, I conclude that the work in question was unit work which should have been assigned to unit employees and that the Employer violated the Agreement by not doing so.[3] Such conclusions are consistent with the authority granted me in Article XVIII of the Agreement.

---

[2] This is particularly so in view of Talbot's testimony that much of the material moved consisted of payroll records, technical books, and supplies, without which COGEMA obviously could not have performed its Hanford-related work.

[3] I have not relied on Union Exhibit No. 1 in reaching this decision because, in agreement with the Employer, I find that settlement agreement is not binding in the circumstances of this case, having been signed by other than the individuals specified in Article XXVI of the Agreement and at a time prior to the execution of the Agreement with the zipper clause contained in Article XIV thereof.

8

**REMEDY**

Although I agree with the Union that a cease and desist order and back pay to relevant unit employees for 347.75 hours are appropriate in this case, the record is insufficient for me to determine the rate at which back pay should be calculated. Accordingly, I shall direct that, unless the parties reach agreement on this question themselves, they file back pay briefs with me on or before Monday, June 26, 2000, to enable me to make that determination.

9

# AWARD

I.  It is the Award of the Arbitrator that the Company violated the Agreement by contracting out the move of COGEMA Engineering Corporation from 1200 Jadwin to the Stevens Center in October and November of 1998.

II.  It is therefore Ordered that:

A.  The Employer cease and desist the contracting out of the moving of the furniture, equipment, and supplies of enterprise companies performing work "at and for the Project Hanford Management Contract;"

B.  The Employer pay to the Union, at a rate to be determined by the Arbitrator, wages equivalent to 347.75 hours of work, said back pay to be distributed by the Union to its members who, in the Union's discretion, would have been assigned to perform the work had it not been assigned to an outside entity; and that

C.  Unless the parties reach agreement thereon, they file remedy briefs with the Arbitrator, with copies to each other, on or before Monday, June 26, 2000, addressing the rate at which hours of back pay shall be calculated.

III.  The Arbitrator hereby reserves jurisdiction for the limited purpose of resolving the question of remedy set forth above and assisting the parties with its implementation.

Monroe, Washington

June 10, 2000

_____

M. Zane Lumbley, Arbitrator

10

# EXHIBIT C

# M. ZANE LUMBLEY

**ARBITRATION, MEDIATION AND FACTFINDING SERVICES**
WASHINGTON OFFICE  -  P. O. BOX 276    MONROE, WASHINGTON 98272-0276
TEXAS OFFICE  -  1411-J NORTH VALLEY MILLS DRIVE, #140    WACO, TEXAS 76710

Office (360) 568-9393  -  Facsimile (360) 568-4872
Nationwide Message Center (800) 477-5047

July 18, 2000

Kenneth J. Pedersen, Esq.
DAVIES ROBERTS & REID, L.L.P.
101 Elliott Avenue West, Suite 550
Seattle, Washington  98119

Charles K. MacLeod, Esq.
Chief Labor Counsel
FLUOR DANIEL HANFORD, INC.
P. O. Box 1000, B3-64
Richland, Washington  99352

Re:    Fluor Daniel Hanford, Inc. and
       Hanford Atomic Metal Trades Council (Teamsters Local 839)
       Movement of Equipment by Non-Bargaining Unit Members
       FMCS Case No. 990513-11169-7 (HAMTC #98-248)

Gentlemen:

         This will confirm my receipt of Mr. MacLeod's July 5, 2000, letter, copy enclosed to Mr. Pedersen, agreeing to the Union's proposed federal judgment interest rate and repeating its agreement on the potential liability amount of $10,002.23 should the Employer's appeal be unsuccessful. Once again, I thank Mr. MacLeod for his cooperation.

         Thank you both for your assistance.

                                                  Yours very truly,

                                                  M. Zane Lumbley

MZL/k
Enc. to Mr. Pedersen

Fluor Hanford
P.O. Box 1000
Richland, WA 99352

APPENDIX C